**[J-84A-2018 and J-84B-2018]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 749 CAP |
| | : | |
| Appellant | : | Appeal from the Order entered on |
| | : | May 22, 2017 in the Court of Common |
| | : | Pleas, York County, Criminal Division, |
| v. | : | granting PCRA relief at No. CP-67- |
| | : | CR-0003183-1998. |
| | : | |
| MILTON NOEL MONTALVO, | : | |
| | : | SUBMITTED: October 3, 2018 |
| Appellee | : | |
| | | |
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 750 CAP |
| | : | |
| Appellee | : | Appeal from the Order entered on |
| | : | May 22, 2017 in the Court of Common |
| | : | Pleas, York County, Criminal Division, |
| v. | : | granting PCRA relief at No. CP-67- |
| | : | CR-0003183-1998. |
| | : | |
| MILTON NOEL MONTALVO, | : | |
| | : | SUBMITTED: October 3, 2018 |
| Appellant | : | |

## OPINION

**JUSTICE BAER**                                        **DECIDED: March 26, 2019**

In this capital murder case arising under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541-9546, both the Commonwealth and Milton Noel Montalvo have filed cross-appeals from the order of the Court of Common Pleas of York County ("PCRA Court"), which denied relief on Montalvo's guilt phase claims, but granted him a new

penalty hearing based on two separate claims of ineffective assistance of counsel. For the following reasons, we affirm the PCRA court's order.[1]

## I. Factual and Procedural Background

While a factual recitation was set forth in the Court's decision on direct appeal, *Commonwealth v. Montalvo*, 986 A.2d 84 (Pa. 2009), we reiterate those facts relevant to the instant PCRA matter. In April of 1998, Appellant[2] was in a grocery store when he had a telephone conversation with his wife, Miriam Ascensio. At the time, the couple had recently separated. After the call, Esther Soto, the owner of the grocery store, heard Appellant tell his brother, Noel Montalvo, that he would kill his wife. Later that night, witnesses observed Ascensio and her coworker, Nelson Lugo (a/k/a Manuel Rodriguez Santana), together at a local bar. Hours later, two neighbors from the apartment directly below Ascensio's apartment heard Appellant shouting outside, demanding entry into Ascensio's residence. The neighbors then heard a window break and Ascensio say, "Call the police." Two other neighbors heard some disturbance occurring on Ascensio's porch, and one neighbor saw a Hispanic male banging on her door. The neighbors explained that they heard people arguing and loud banging noises coming from the apartment throughout the night, albeit no one summoned the authorities.

The following morning, one neighbor observed broken glass on Ascensio's porch, knocked on the door, and received no response. After looking into the window and observing a male lying on the floor, the neighbor instructed his wife to call the police. Upon their arrival, the police discovered the bodies of Ascensio and Lugo inside the residence. Ascensio's neck was slashed several times, her skull fractured by a blunt

---

[1] The PCRA court's final order in this capital case is directly appealable to this Court pursuant to 42 Pa.C.S. § 9546(d).

[2] Although both Montalvo and the Commonwealth are appellants herein, for ease of discussion we refer to Montalvo as "Appellant."

object, and her eye punctured. Ascensio's body was naked from the waist down with a high-heeled shoe in her genital area and panties on her face. Lugo's body had a fatal stab wound to the chest, and a tube of lipstick was protruding from his teeth. Crime scene investigators collected a blood sample on a window blind hanging inside the broken pane of glass in Ascensio's porch door and another blood sample on a cloth bag found on a sofa bed. Both samples were later determined to be Appellant's blood.

Esther Soto thereafter gave a tape-recorded statement to police, relaying what she heard at the grocery store. She further indicated that Appellant and his brother appeared at her home the morning after the murders and that Appellant stated, "We killed my wife." Soto also told police that the men explained that Appellant killed Lugo and his brother killed Ascensio, and that they intended to flee to Florida or the Dominican Republic. More than eight months later, in January of 1999, police apprehended Appellant in Florida.[3] In a recorded statement to police, Appellant denied any involvement in the murders.

The Commonwealth subsequently charged Appellant with two counts of murder, and trial commenced in January of 2000. The prosecution's trial theory was that Appellant and his brother, who was still at large at the time, committed the murders of Ascensio and Lugo. The Commonwealth presented the testimony of Ascensio's neighbors to establish Appellant's presence at the crime scene. It further presented forensic evidence establishing that Appellant's blood was found on the window blind and on a fabric bag in Ascensio's apartment. The Commonwealth additionally presented the testimony of Soto,

---

[3] Appellant's brother Noel remained a fugitive for several years. Federal authorities apprehended Noel in New Jersey in 2002, and the Commonwealth subsequently charged him with two counts of murder. Following trial in 2003, Noel was convicted of the first degree murder of Ascensio, the second degree murder of Lugo, conspiracy to commit homicide, and burglary. He was sentenced to death. This Court affirmed his judgment of sentence, *Commonwealth v. (Noel) Montalvo*, 956 A.2d 926 (Pa. 2008), and the United States Supreme Court denied his petition for *certiorari*. *Montalvo v. Pennsylvania*, 556 U.S. 1186 (2009).

who stated that she remembered Appellant coming into her store on the day of the murder, but recanted her earlier statement that she heard Appellant say that he would kill his wife. Soto further testified that while Appellant and Noel came to her home on the day after the murders, they did not confess to the killings. Soto explained that she had lied to Detective Roland Camacho when she told him that Appellant and Noel had confessed because the detective had threatened to send her to jail, close down her business, and take away her children if she did not implicate Appellant in the murders.

Detective Camacho also testified at Appellant's trial, disputing Soto's claim in this regard. The Commonwealth thereafter entered into evidence Soto's tape-recorded statement to police, indicating that Appellant had told her prior to the murders that he planned to kill his wife, and confessed that he and Noel had done so after the murders had been committed. Additionally, germane to an issue herein, the Commonwealth presented the testimony of Detective Michael Hose of the York City Police Department who stated that when he arrived at the crime scene, he observed "a high-heel shoe jammed up into [Ascensio's] crotch area that protruded through her legs that was visible." N.T., 1/14/2000, at 756.

The defense's trial theory was that Appellant was not involved in the murders and that his brother had committed the offenses. In support of this theory, Appellant presented character witnesses attesting to his law-abiding reputation and argued to the jury that the Commonwealth did not establish his participation in the killings beyond a reasonable doubt. During his closing argument, the prosecutor referenced the placement of the high-heeled shoe in Ascensio's genital area, stating, "Then someone, still out of anger, took a shoe and violated Miriam Ascensio again; and that someone was Defendant." N.T., 1/19/2000, at 1206.

Following trial, the jury convicted Appellant of two counts of first degree murder. Before the penalty hearing commenced, Appellant's trial counsel petitioned the trial court for the appointment of a mental health expert, but the trial court denied the request. Nevertheless, Dr. Allan Tepper, J.D., Ph.D, met with Appellant for more than three hours on January 16, 2000, during the guilt phase of trial, to conduct a screening evaluation for major mental illness, but not a comprehensive evaluation for mitigation evidence. Appellant told Dr. Tepper that he was not involved in the killings. Following the evaluation, Dr. Tepper concluded that Appellant did not display any signs of major mental illness and possessed intellectual functioning in the average range. Accordingly, Dr. Tepper did not recommend further neuropsychological testing.

During the penalty hearing, relating to Ascensio's murder, the Commonwealth presented, *inter alia*, evidence in support of three aggravating circumstances: commission of the killing during the perpetration of a felony, 42 Pa.C.S. § 9711(d)(6), commission of multiple murders, *id.*, § 9711(d)(11), and commission of the killing by means of torture, *id.,* § 9711(d)(8). The defense presented, *inter alia*, evidence supporting the mitigating circumstances that Appellant had no significant history of prior criminal convictions, *id.*, § 9711(e)(1), and other evidence of mitigation, *id.*, § 9711(e)(8), including Appellant's prison record, education, ability to be productive, and positive character evidence.

Germane to an issue on appeal, during the penalty proceeding the prosecutor repeatedly stated to the jury that its role was to "recommend" a sentence of death. The trial court subsequently reaffirmed this notion when responding to an objection, stating to the jury, "I am the sentencing person. Your decision is a recommendation to the court." N.T., 1/21/2000, at 136. Trial counsel did not object to these comments.

Ultimately, the jury found all of the aforementioned aggravating and mitigating factors relating to Appellant's conviction for the murder of Ascensio. The jury further found

the identical aggravating and mitigating factors relating to the conviction for Lugo's murder, with the exception of the torture aggravator. Finding that the aggravating factors outweighed the mitigating circumstances, the jury returned two verdicts of death for the murders of Ascensio and Lugo.

Represented by new counsel, Appellant filed a direct appeal in this Court, raising thirty-seven issues for review, twenty of which challenged trial counsel's effectiveness.[4] This Court affirmed Appellant's judgment of sentence of death on December 28, 2009. *Montalvo, supra*. The United States Supreme Court denied Appellant's petition for a writ of *certiorari* on October 4, 2010. *Montalvo v. Pennsylvania*, 562 U.S. 857 (2010).

On August 30, 2011, Appellant timely filed a *pro se* motion for post-conviction relief. The PCRA court denied relief on September 26, 2011, mistakenly believing that Appellant had already received PCRA review because he had litigated ineffectiveness claims on direct appeal. Appellant subsequently filed a notice of appeal to this Court. By *per curiam* order dated April 5, 2012, this Court granted the parties' joint motion to relinquish jurisdiction and remanded the matter to the PCRA court with "directions to permit [A]ppellant to file a first, of-right, counseled petition pursuant to the [PCRA]." *Commonwealth v. Montalvo*, No. 639 CAP (filed Apr. 5, 2012).

---

[4] At the time Appellant filed his direct appeal in 2000, this Court had not yet decided *Commonwealth v. Grant*, 813 A.2d 726 (Pa. 2002), which held that challenges to trial counsel's performance should generally be deferred until collateral review. Accordingly, we remanded the ineffectiveness claims that Appellant presented on direct appeal to the trial court for an evidentiary hearing. By the time the direct appeal returned to this Court after the evidentiary hearing, *Grant* had been decided. Nonetheless, we addressed Appellant's ineffectiveness claims on direct appeal based upon our holding in *Commonwealth v. Bomar*, 826 A.2d 831 (Pa. 2003), which recognized a limited exception to *Grant's* general deferral rule in pre-*Grant* cases where there had been a hearing in the trial court on the ineffectiveness claims and the trial court had issued an opinion addressing those claims.

On July 16, 2012, Appellant, again represented by new counsel, filed an amended PCRA petition, raising ten claims for relief. Notably, Appellant's defense theory of the case changed dramatically from that presented at trial. Rather than denying participation in the murders, Appellant disclosed to Julie Kessel, M.D., who had been retained by PCRA counsel, that he committed the murders of Ascensio and Lugo after looking into Ascensio's porch window and seeing her walking naked from her bedroom with a partially-clothed man in the apartment. Believing that Ascensio was having sex with the man in the apartment, Appellant told Dr. Kessel that he broke the door open and entered the apartment. Appellant relayed that the man pulled a knife and lunged towards him, and that Appellant turned that knife towards the man, fatally stabbing him in the chest. He then explained that he seized a two-by-four piece of wood from underneath an exercise machine, and continually struck Ascensio in the head until she fell to the ground. He then retrieved the knife and fatally stabbed her while in an intense rage. Appellant made a similar statement to Ricardo Weinstein, Ph.D., another mental health expert retained by PCRA counsel. As explained *infra*, Appellant did not testify to this altered account of the murders at the PCRA hearing; rather, his mental health experts conveyed his narrative to the court.

Based on this new theory, Appellant raised various contentions in his July 15, 2012 PCRA petition, including that trial counsel's performance during the guilt phase of trial was constitutionally deficient because he failed to investigate, develop, and present evidence of defenses to first degree murder, such as voluntary manslaughter and self-defense. He also argued that trial counsel was ineffective for failing to challenge the evidence and the statements made by the prosecutor allegedly suggesting that Appellant had sexually assaulted Ascensio with a high-heeled shoe.

Regarding the penalty phase of trial, Appellant contended in his PCRA petition that trial counsel was ineffective for failing to investigate and present mitigation evidence relating to Appellant's mental health and his life history. He further alleged that trial counsel was ineffective for failing to object when the prosecutor informed the jury that its task was to "recommend" a sentence of death to the court and the trial court acquiesced in that sentiment, thereby diminishing the jury's sense of responsibility in determining the sentence in violation of *Caldwell v. Mississippi*, 472 U.S. 320, 328-29 (1985) (holding that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere"). Appellant also contended that he was entitled to relief from his conviction and sentence because of the cumulative effect of the trial errors. Finally, as he had presented ineffectiveness claims in his direct appeal prior to this Court's adoption of the general deferral rule in *Grant*, Appellant further alleged in his PCRA petition that all prior counsel were ineffective for failing to pursue the enumerated claims of trial counsel ineffectiveness.

On January 23, 2015, Appellant supplemented his PCRA petition, developing further his appellate counsel ineffectiveness claims by analyzing each level of counsel's representation under the *Pierce* ineffectiveness standard.[5] Appellant also filed a post-hearing PCRA memorandum with the PCRA court on June 3, 2016, in which he expanded upon the legal arguments relating to the claims previously raised.

The PCRA court held a series of evidentiary hearings on July 27-28, 2015; December 1-2, 2015; March 28, 2016; and May 3, 2016. During these hearings, Appellant presented, *inter alia*, the testimony of Dr. Julie Kessel, who opined that Appellant's most

---

[5] As noted *infra*, this Court set forth the three prongs of the ineffective assistance of counsel standard in *Commonwealth v. Pierce*, 527 A.2d 973, 975 (Pa. 1987).

recent account of the murders established two grounds of serious provocation for the killings that rendered Appellant incapable of cooling down and acting with reason: (1) Appellant's recognition of Ascensio's sexual relationship with Lugo; and (2) Appellant's resultant confrontation with Lugo. N.T., 12/1/2015, at 44. Relating to the penalty phase of trial, Dr. Kessel testified that mental health mitigation evidence could have been presented at Appellant's penalty hearing to support two additional mitigating circumstances, *i.e.*, that at the time of the killings Appellant was under extreme emotional disturbance, 42 Pa.C.S. § 9711(e)(2), and that his capacity to appreciate the criminality of his conduct was substantially impaired, *id.*, § 9711(e)(3). N.T., 12/1/2015, at 48-49.

Appellant also presented the testimony of Ricardo Weinstein, Ph.D., a psychologist who conducted various neuropsychological tests on Appellant. Dr. Weinstein concluded that Appellant suffered from brain dysfunction in that his frontal lobes had not matured properly or had been damaged, resulting in serious issues with planning and organizing behavior, impulse control, and understanding complex situations. N.T., 7/28/2015, at 171, 177.[6] Further, based on a similar account of the events that Appellant provided to Dr. Kessel, Dr. Weinstein opined that seeing Ascensio naked in the apartment with another man caused a sudden and intense passion and served as a provocation for the killings. *Id.*, at 184-86. Finally, Dr. Weinstein opined that, at the time of the killings, Appellant was under extreme mental or emotional disturbance and lacked the capacity to appreciate the criminality of his conduct. *Id.*, at 187.

Appellant further presented the testimony of Dr. Tepper, who had screened Appellant for major mental illness prior to the penalty hearing and found none, although he did not conduct a full-blown mitigation investigation. N.T., 12/2/2015, at 93. Dr. Tepper

---

[6] The PCRA court did not find credible the testimony that Appellant suffered from a brain dysfunction and did not rely on this testimony in granting a new penalty hearing. PCRA Court Opinion, 5/22/2017, at 67.

testified at the PCRA proceeding that he reviewed the post-conviction reports of Drs. Kessel and Weinstein and asserted that if he had known that Appellant confessed to the killings, he would have explored defenses such as heat of passion or self-defense. *Id.*, at 99. Dr. Tepper further explained that if he had been given sufficient time for a complete investigation into mitigation evidence, he would have been able to testify at the penalty hearing that Appellant was under extreme emotional distress at the time of the killings and that his capacity to appreciate the criminality of his conduct was substantially impaired. *Id.*, at 95-96.

Relevant here, Appellant also presented the expert testimony of Charles Wetli, a forensic pathologist, who testified that the crime scene and Ascensio's injuries were consistent with a killing committed pursuant to a "rage reaction," while Lugo died from a single knife wound to the chest. N.T., 7/27/2015, at 122. Finally, Robert Tressel, an expert in homicide investigation, crime scene analysis, and medical-legal death investigation, testified that Ascensio's injuries were typical of a passion-related homicide investigation where the killing occurs from a sudden anger. N.T., 3/28/2016, at 32. Additionally, Appellant presented evidence at the PCRA hearing of his life history to support the catchall mitigating factor. 42 Pa.C.S. § 9711(e)(8).

In rebuttal, the Commonwealth presented, *inter alia*, the testimony of Stephen M. Mechanick, M.D., who disagreed with the post-conviction defense experts' opinions that Appellant demonstrated impulsivity. N.T., 5/3/2015, at 110, 112. Further, Dr. Mechanick disagreed that Appellant experienced an intense passion resulting from serious provocation immediately prior to the murders, leaving him incapable of cool reflection. *Id.,* at 113. Dr. Mechanick explained that he could not reach such a conclusion to a reasonable degree of psychiatric certainty because Appellant had offered different versions of what occurred at the time of the murders, and, thus, he was not a reliable

informant. *Id.* Notably, even assuming that Appellant was truthful in his post-conviction account of the events leading to the murders, Dr. Mechanick testified that it would be inconsistent to assert that Appellant was acting reasonably in self-defense when he fatally stabbed Lugo, but that moments later he was incapable of cool reflection when he fatally stabbed Ascensio. *Id.* Dr. Mechanick additionally disagreed that Appellant suffered any brain damage. *Id.*, at 123-24. Dr. Mechanick emphasized that Appellant was able to maintain relationships, work, and complete school without any notable cognitive impairment. *Id.*, at 126. Finally, Dr. Mechanick opined that there was insufficient evidence to support the mitigating circumstances that Appellant was under extreme emotional distress at the time of the killings and that he had substantially impaired capacity to conform his conduct to the requirements of law. *Id.*, at 131-134.

Appellant's trial counsel, Daniel Rendine, Esquire, testified at the PCRA hearing that he discussed with Appellant alternative defenses to the first degree murder charges that required the admission of culpability, but that Appellant denied involvement in the murders and was adamant that he did not want to assert those defenses. N.T., 7/27/2015, at 42, 52. While counsel acknowledged that Appellant stated, "I did this shit" to one of his investigators, counsel explained that he was uncertain what Appellant meant by this statement, as he never indicated to counsel that he killed the victims and was in absolute agreement with the defense presented. *Id.*, at 48, 53, 57. Attorney Rendine further testified that he did not pursue mental health mitigation evidence during the penalty phase of trial because Dr. Tepper had indicated to him that Appellant did not suffer from any major mental illness. *Id.*, at 22. He testified that there was no evidence suggesting that Appellant was mentally or emotionally impaired and that if Dr. Tepper had recommended neuropsychological testing, he would have pursued such course of action. *Id.*, at 54.

By opinion dated May 22, 2017, the PCRA court denied Appellant relief on his guilt phase claims, but granted him a new penalty hearing.[7] Relevant here, the court rejected Appellant's claim that trial counsel was ineffective for failing to investigate and present the defenses of self-defense and heat of passion at trial. The PCRA court reasoned that because Appellant denied participating in the murders and steadfastly agreed with the defense theory that his brother committed the offenses, trial counsel had a reasonable basis for not investigating and pursuing defenses that required Appellant to admit culpability. PCRA Court Opinion, 5/22/2017, at 53-54. The court also found unpersuasive Appellant's contention that trial counsel was ineffective for failing to object to evidence that Appellant had sexually violated Ascensio with a shoe. The court found that the prosecutor's reference during closing arguments was a reasonable inference arising from the testimony of Detective Hose as well as the testimony of the forensic expert, both of

---

[7] As referenced *supra*, new counsel represented Appellant on direct appeal and raised claims of ineffective assistance of counsel, as was his right at that time. *See Grant*, *supra*. Thus, the cognizable claims before the PCRA court were "layered" claims of ineffectiveness based upon appellate counsel's failure to allege trial counsel's ineffectiveness on the various grounds. *Commonwealth v. McGill*, 832 A.2d 1014, 1021 (Pa. 2003). In analyzing Appellant's claims, however, the PCRA court did not focus on appellate counsel's failure to present claims of trial counsel ineffectiveness on appeal, although the court recognized generally that Appellant framed his claims as such. Instead, the PCRA court generally adjudicated the claims of trial counsel ineffectiveness. Accordingly, Appellant's brief to this Court assigns error to the PCRA court's holdings in relation to the claims of trial counsel ineffectiveness, without concentrating on appellate counsel's performance. The Commonwealth now contends that Appellant's brief is deficient in this regard and seeks a ruling deeming all ineffectiveness claims waived. *See* Attorney General's Consolidated Reply Brief for Appellant and Brief for Cross-Appellee, at 67-68. We decline the Commonwealth's request. As noted, Appellant layered his claims of ineffectiveness properly in his counseled PCRA petition, developed each claim of appellate counsel ineffectiveness in his amended PCRA petition filed on January 23, 2015, and merely focused his brief to this Court on the deficiencies in the PCRA court's adjudication of his claims.

whom observed the placement of the shoe in Ascensio's genital area. PCRA Court Opinion, at 61.

As to the penalty phase claims, the PCRA court found two separate grounds to grant a new penalty hearing. First, the court held that trial counsel was ineffective for failing to present mental health expert testimony to support the additional mitigating circumstance that Appellant was laboring under extreme mental or emotional disturbance. *Id.*, at 69. The court expressed concern over its failure to grant Appellant's request for pretrial funding for a mental health expert, which, in its view, "severely crippled counsel's ability to timely obtain favorable mitigation evidence." *Id.*, at 68. The PCRA court concluded that the combination of the court's denial of funds for an expert and the failure of counsel to explore properly the mitigation issue prior to the eve of the penalty phase hearing deprived Appellant of a fair proceeding. *Id.,* at 68-69.

Second, the PCRA court held that trial counsel was ineffective for failing to object when the prosecutor repeatedly told the jury that its sentencing verdict was only a "recommendation," and the trial court agreed with this sentiment by stating that the jury's sentencing decision "is a recommendation to the court." N.T., 1/21/2000, at 136. Acknowledging that the trial court noted correctly in its final jury charge that the jury's sentencing verdict was not a mere recommendation, N.T., 1/21/2000, at 168, the PCRA court found that this latter statement served only to confuse the jury as to its role in sentencing. PCRA Court Opinion, at 72-73 (citing *Caldwell, supra*).

As noted, Appellant has filed an appeal challenging the PCRA court's denial of his guilt phase claims, and the Commonwealth has filed an appeal challenging the grant of a new penalty hearing. In his appeal, Appellant claims that trial counsel was ineffective for failing to present evidence of defenses to first degree murder and for not objecting to evidence that Appellant sexually assaulted Ascensio with a shoe. He further contends

that the cumulative effect of the trial errors entitled him to relief from his conviction and sentence. In its cross-appeal, the Commonwealth contends that the PCRA court made multiple errors of law in granting a new penalty hearing on the ground that trial counsel was ineffective for failing to present mental health mitigation evidence.[8] The Commonwealth also argues that the PCRA court erred in granting a new penalty hearing on the ground that trial counsel was ineffective for failing to object when the prosecutor repeatedly informed the jury that its sentencing verdict was only a "recommendation" and the trial court reaffirmed this misstatement of the law.

## II. General Principles of Law

To be eligible for PCRA relief, a petitioner must prove by a preponderance of the evidence that his conviction or sentence resulted from one or more of the circumstances enumerated in 42 Pa.C.S. § 9543(a)(2). These circumstances include a constitutional violation or ineffectiveness of counsel which "so undermines the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." *Id.*, § 9543(a)(2)(i) and (ii). A petitioner must further establish that his claims have not been previously litigated or waived. *Id.,* § 9543(a)(3). An issue has been previously litigated if "the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue." *Id.,* § 9544(a)(2). A claim is waived under the PCRA "if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal or in a prior state postconviction proceeding." *Id.,* § 9544(b).

---

[8] Specifically, the Commonwealth contends that there was insufficient evidence to support the mitigating factor of extreme mental or emotional disturbance; there was insufficient evidence to augment the trial evidence supporting the catch-all mitigator; the PCRA court failed to acknowledge the testimony of the Commonwealth's mental health expert; and the PCRA court erred by imposing the current standard for presenting mental health mitigation evidence onto trial counsel's duty, which arose twenty years ago.

Appellant's primary claims challenge the effectiveness of counsel. It is well established that counsel is presumed to have rendered effective assistance. *Commonwealth v. Sepulveda*, 55 A.3d 1108, 1117 (Pa. 2012). To obtain relief on a claim challenging counsel's performance, a PCRA petitioner must satisfy the performance and prejudice test announced in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In Pennsylvania, we apply the *Strickland* test by examining whether: (1) the underlying claim has arguable merit; (2) counsel lacked a reasonable basis for his actions or failure to act; and (3) the petitioner was prejudiced by counsel's deficient performance such that there is a reasonable probability that the result of the proceeding would have been different absent counsel's error or omission. *Commonwealth v. Pierce*, 527 A.2d 973, 975 (Pa. 1987).

A petitioner's failure to satisfy any prong of the ineffectiveness test is fatal to the claim. *Commonwealth v. Wholaver*, 177 A.3d 136, 144 (Pa. 2018). We are not required to analyze the elements of an ineffectiveness claim in any particular order; if a claim fails under any prong of the ineffectiveness test, the Court may proceed to that element first. *Sepulveda*, 55 A.3d at 1117-18. Moreover, counsel cannot be deemed ineffective for failing to raise a meritless claim. *Commonwealth v. Treiber*, 121 A.3d 435, 445 (Pa. 2015). Further, where, such as here, a petitioner must "layer" claims of ineffective assistance of counsel, he "must plead in his PCRA petition that his prior counsel, whose alleged ineffectiveness is at issue, was ineffective for failing to raise the claim that the counsel who preceded him was ineffective in taking or omitting some action." *Commonwealth v. McGill*, 832 A.2d 1014, 1023 (Pa. 2003). The petitioner must further "present argument, in briefs or other court memoranda, on the three prongs of the *Pierce* test as to each relevant layer of representation." *Id.*

Upon reviewing an order in a PCRA matter, we must determine whether the findings of the PCRA court are supported by the record and whether the court's legal conclusions are free from error. *Commonwealth v. Hannibal*, 156 A.3d 197, 206 (Pa. 2016). The findings of the PCRA court and the evidence of record are viewed in a light most favorable to the prevailing party. *Commonwealth v. Koehler*, 36 A.3d 121, 131 (Pa. 2012)*.* The PCRA court's credibility determinations, when supported by the record, are binding; however, this court applies a *de novo* standard of review to the PCRA court's legal conclusions. *Commonwealth v. Roney*, 79 A.3d 595, 603 (Pa. 2013). We must keep in mind that the petitioner has the burden of persuading this Court that the PCRA court erred and that such error requires relief. *Wholaver*, 177 A.3d at 144-45. Finally, this Court may affirm a valid judgment or order for any reason appearing of record. *Id.* at 145.

### III. Discussion

### A. Appellant's Guilt Phase Claims

### (1) Failure to Investigate Defenses to First Degree Murder

Appellant contends that the PCRA court erred by rejecting his claim that trial counsel was ineffective for failing to investigate and present the defenses of heat of passion (relating to Ascensio) and self-defense (relating to Lugo) at his trial. *See* 18 Pa.C.S. § 2503(a)(1) (providing that a "person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by . . . the individual killed"); *id.,* § 2503(b) (providing that a "person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the

circumstances to be such that, if they existed, would justify the killing under Chapter 5 of this title (relating to general principles of justification), but his belief is unreasonable").[9]

Essential to Appellant's claim is his assertion that he admitted his guilt to trial counsel prior to trial, and that trial counsel ignored his confession, choosing instead to present a defense that was unsupported by the evidence, without advising him of the defenses of heat of passion and self-defense. Appellant argues that the PCRA court likewise failed to acknowledge that he admitted his guilt to trial counsel. He concludes that the PCRA court's finding that he denied involvement in the killings was, therefore, unsupported by the record and its legal conclusion, that trial counsel acted reasonably in refusing to pursue defenses that required him to admit culpability, was erroneous.

To develop the arguable merit of his ineffectiveness claim, Appellant relies primarily upon the testimony of his mental health experts, as Appellant did not testify to his new defense theory at the PCRA evidentiary hearing. Appellant argues that the post-conviction record demonstrates that he believed Lugo was trying to harm him with a knife, and that Appellant was able to turn the knife and drive it into Lugo's chest. Cross Brief of Appellee, at 61 (citing N.T., 12/1/2015, at 30-33 (Dr. Kessel opining that after observing Ascensio naked with a man, a physical altercation ensued between Appellant and Lugo whereby Appellant believed Lugo was trying to harm or kill him and Appellant was able to turn Lugo's knife and drive it into Lugo's chest)). Regarding Ascensio's murder, Appellant submits that the post-conviction record demonstrates a textbook account of a

---

[9] Appellant does not expressly characterize his claim as involving "imperfect" self-defense as set forth in 18 Pa.C.S. § 2503(b), which encompasses an unreasonable, as opposed to a reasonable belief that the killings were justified. Nevertheless, the general theme of Appellant's argument is that trial counsel's performance was constitutionally deficient because he did not present defenses to the charges of first degree murder, which could have reduced his convictions to voluntary manslaughter. As demonstrated *infra*, whether Appellant is alleging a reasonable or unreasonable belief that the killing of Lugo was justified has no impact on our ultimate analysis of this claim.

frenzied heat of passion killing after he became enraged after witnessing his wife in what appeared to be a sexual encounter. *See id.*, at 62 (citing N.T., 12/1/2015, at 44-45 (Dr. Kessel opining that Appellant's observation of Ascensio naked with Lugo in the apartment caused a sudden and intense passion that resulted in Appellant becoming incapable of cooling down and acting in a reasonable manner)). *See also* N.T., 7/28/2015 (Dr. Weinstein opining that neuropsychological testing performed upon Appellant established that he suffered from brain dysfunction and difficulties with planning and organizing behavior and with impulse control).[10]

Appellant's argument on the reasonable basis prong of the ineffectiveness test is likewise dependent upon his assumption that trial counsel knew that Appellant committed the murders and that he would have consented to admitting culpability at trial. He contends that trial counsel's defense strategy to blame the murders on Appellant's brother was unreasonable because trial counsel declined to investigate other defenses, notwithstanding that police discovered Appellant's blood at the crime scene and there was purportedly little credible evidence of his brother's guilt.[11] Appellant concludes that reasonable counsel would have discussed possible defenses with him and would have informed the mental health expert that Appellant confessed to the murder and directed such expert to explore mental health defenses. *See* Cross Brief of Appellee, at 73 (citing

---

[10] As additional support for the arguable merit prong of the ineffectiveness claim, Appellant relies upon the testimony of Charles Wetli, a forensic pathologist who opined that Ascensio's injuries were consistent with a killing committed pursuant to a "rage reaction," *see* Cross Brief of Appellee at 63-64 (citing N.T., 7/27/2015, at 122), as well as the testimony of Robert Tressel, a homicide investigation expert who opined that Ascensio's injuries were typical of a passion-related homicide investigation where the killing results from sudden anger. *Id.*, at 64 (citing N.T., 3/28/2016, at 32).

[11] As noted *supra* at n. 3, a jury subsequently convicted Appellant's brother of the first degree murder of Ascensio, the second degree murder of Lugo, conspiracy to commit homicide, and burglary. *See Commonwealth v. (Noel) Montalvo*, 956 A.2d 926 (Pa. 2008).

*Commonwealth v. McCusker*, 292 A.2d 286, 289 (Pa. 1972) (holding that mental health expert testimony is admissible to establish a defendant's state of mind in relation to a heat of passion defense)).

Finally, addressing the prejudice prong of the *Pierce* ineffectiveness standard, Appellant posits that had trial counsel investigated and presented a self-defense theory for Lugo's murder and a heat of passion defense for Ascensio's murder, there is a reasonable probability that the outcome of the trial would have been different. In Appellant's view, the jury would not have returned two verdicts of first degree murder if it had heard expert testimony regarding his admission of the killings and how they took place in the heat of passion and in response to life-threatening provocation.

The Commonwealth responds that Appellant's ineffectiveness claim fails for lack of a factual predicate. It argues that the post-conviction record does not support Appellant's assertion that he confessed his guilt to trial counsel or communicated to trial counsel the rendition of the facts upon which he now relies. The Commonwealth characterizes Appellant's new defense theory as "revisionist history" based upon his self-serving rendition of events that he conveyed only to post-conviction mental health experts years after his convictions and to which Appellant did not testify during the PCRA evidentiary hearing. Attorney General's Consolidated Reply Brief for Appellant and Brief for Cross-Appellee, at 69. According to the Commonwealth, the accounts of the murders that Appellant disclosed to the various post-conviction mental health experts were inconsistent with each other in material detail; thus, there is no way to discern whether there was any credible evidence of self-defense or serious provocation.

Even accepting as true the factual account of the murders that Appellant provided to Dr. Kessel, the Commonwealth contends that there was no evidence suggesting that Appellant killed the victims in self-defense or in the heat of passion. To demonstrate that

Appellant killed Lugo in self-defense, the Commonwealth argues, Appellant would have to admit that he intentionally killed Lugo to protect himself. It points out that under Appellant's new factual narrative of the events, however, he conceded that he broke into Ascensio's apartment, as demonstrated by the physical evidence of the broken windowpane in the front door. Thus, the Commonwealth submits, Appellant would have this Court conclude that Lugo was, in fact, the aggressor, despite the fact that Appellant took the couple by surprise by making a violent, forced entry into the residence in the middle of the night.

Further, the Commonwealth contends, Appellant's post-conviction factual recitation does not suggest that Appellant killed Ascensio in a frenzied heat of passion. The Commonwealth argues that the facts, as conveyed to Dr. Kessel, suggest a calculated killing of Ascensio. It highlights that, according to Appellant, he removed a two-by-four from under an exercise machine, struck Ascensio several times in the head, and proceeded to stab her fatally, after which he replaced the two-by-four beneath the exercise machine, washed and tended to the cuts on his hand, retrieved the knife, and locked the apartment door before leaving. Under these circumstances, the Commonwealth finds no arguable merit to Appellant's ineffectiveness claim for failing to present the enumerated defenses to first degree murder.

The Commonwealth additionally refutes Appellant's assertions regarding the second prong of the ineffectiveness test, *i.e.,* that trial counsel's performance was unreasonable because he failed to investigate or present defenses of heat of passion and self-defense, and failed to inform the mental health expert of Appellant's confession for purposes of investigating mental health defenses. It reiterates that there is no evidence in the record demonstrating that Appellant informed trial counsel of the alleged facts in support of the defenses at issue. The Commonwealth concludes that the record, instead,

supports the PCRA court's findings that trial counsel advised Appellant of all relevant defenses, after which Appellant adamantly informed counsel that he would not admit culpability at trial, and wanted to proceed with the defense that his brother was the perpetrator. The Commonwealth asserts that under circumstances where Appellant denied involvement in the murders in his statement to police, in discussions with trial counsel, and again during his mental health evaluation with Dr. Tepper, his challenge to counsel's performance based on the failure to present defenses that admitted his culpability should not succeed. Considering the lack of merit of the ineffectiveness claim and that trial counsel had a reasonable basis for failing to pursue the defenses of heat of passion and self-defense, the Commonwealth concludes that Appellant cannot demonstrate prejudice arising from trial counsel's performance in this regard.

In his reply brief, Appellant acknowledges that he did not admit his involvement in the killings at the time police arrested and interrogated him, but asserts that he did so by stating, "I did this shit," to one of trial counsel's investigators during a meeting at prison before trial. *See* Cross Reply Brief of Appellee, at 6 (citing N.T., 7/27/2015, at 47-49). Appellant discounts as incredible trial counsel's testimony at the PCRA evidentiary hearing that Appellant made such statement to the investigator and never to counsel, and that trial counsel was uncertain as to what Appellant intended by the statement. He reiterates his contention that trial counsel failed to probe into why Appellant made such a statement and discuss the relevant defense options with him.

We begin our analysis by emphasizing the PCRA court's credibility findings. As noted, the PCRA court found that trial counsel meaningfully discussed with Appellant the Commonwealth's evidence against him, as well as potential defenses to the first degree murder charges, but Appellant insisted that he did not commit the killings. PCRA Court Opinion, at 53-54. Based on this factual finding, the PCRA court held as a matter of law

that trial counsel acted reasonably by not investigating and pursuing defenses of heat of passion and self-defense, which would have required Appellant to admit culpability. *Id.*, at 54. Upon careful review, we conclude that the PCRA court's factual findings on this issue are supported by the record and that the court did not commit an error of law in rejecting Appellant's ineffectiveness claim on the reasonable basis prong of the ineffectiveness standard.

Germane to the heat of passion component of the ineffectiveness claim, we observe that "a defendant charged with murder may establish that he is guilty, not of murder, but rather of voluntary manslaughter, by proving that, at the time of the killing, he was acting under a sudden and intense passion resulting from serious provocation by the victim." *Commonwealth v. Busanet*, 54 A.3d 35, 55 (Pa. 2012) (citing *Commonwealth v. Mille*r, 987 A.2d 638, 649 (Pa. 2009); 18 Pa.C.S. § 2503(a)). A defense of heat of passion is available to a defendant who admits criminal liability at trial, but contests the degree of guilt. The defense of self-defense requires the defendant to admit that the killing was intentional, but warranted to protect one's self. *Commonwealth v. Philistin*, 53 A.3d 1, 12 (Pa. 2012).

The record before us does not establish that Appellant admitted culpability to counsel prior to trial. Rather, it supports the PCRA court's findings that trial counsel discussed alternative defenses to the first degree murder charges and that Appellant knowingly rejected defense strategies that required him to admit criminal liability. Initially, the record discloses that trial counsel informed Appellant that the Commonwealth made a pretrial offer of two life sentences in exchange for his guilty pleas to both counts of first degree murder. N.T., 7/27/2015, at 17. Trial counsel asserted that, considering the Commonwealth's evidence against Appellant, he explained to Appellant that he thought

it was in his best interests to accept the offer and plead guilty, but that Appellant "wanted no parts of it" and refused the offer. *Id.*, at 49.

Trial counsel further testified that he explained to Appellant the defenses of diminished capacity and voluntary manslaughter, but that Appellant "was adamant that he wanted to fight the case and did not want to plead guilty." *Id.*, at 51. He asserted that he discussed the defense of heat of passion with Appellant, but that he "was not interested in admitting his guilt and not interested in [counsel] admitting his guilt on his behalf." *Id.,* at 52. Trial counsel testified that Appellant was one hundred percent in agreement with the defense that his brother committed the killings and expressed no reservations about pursuing that defense. *Id.*, at 52-53. He confirmed that at no time during the course of the trial did Appellant indicate to counsel that he killed the victims. *Id.*, at 57. While trial counsel acknowledged that Appellant stated, "I did this shit," to his investigator, trial counsel explained that he was uncertain exactly what Appellant meant by that statement, emphasizing that Appellant "was absolutely bent" on pleading not guilty and insisted that he was innocent without a doubt. *Id.*, at 48, 58.

The PCRA court credited trial counsel's testimony in this regard. It is well established that a PCRA court's credibility findings are to be afforded great deference and where, as here, they are supported by the record, such determinations are binding on an appellate court. *Commonwealth v. Treiber*, 121 A.3d at 444. Additionally, we emphasize that Appellant did not refute trial counsel's assertions at the PCRA hearing by testifying on his own behalf; thus, the record is devoid of any evidence establishing that Appellant informed trial counsel of the particular account of the murders upon which he now asserts would support claims of heat of passion and self-defense.

In determining whether counsel lacked a reasonable basis, the court "does not question whether there were other more logical courses of action which counsel could

have pursued; rather, [the court] must examine whether counsel's decisions had any reasonable basis." *Commonwealth v. Bardo*, 105 A.3d 678, 684 (Pa. 2014) (citing *Roney*, 79 A.3d at 604). We have no hesitation in concluding that trial counsel had a reasonable basis for declining to pursue defenses that required the admission of culpability when Appellant fervently rejected such defense strategy. *See Commonwealth v. Weaver*, 457 A.2d 505, 506 (Pa. 1983) (holding that the authority to present a defense conceding general liability is solely within the province of the accused). Accordingly, the PCRA court committed no error of law in concluding that trial counsel's performance was reasonable, and, thus, his claim of trial counsel ineffectiveness fails. Similarly, the derivative claim of appellate counsel ineffectiveness for failing to raise this issue on appeal fails for lack of arguable merit.

### (2) Failure to Challenge Evidence of a Sexual Assault with a Shoe

Appellant next contends that the PCRA court erred by rejecting his claim that trial counsel was ineffective for failing to challenge, during the guilt-phase of trial, the admission of evidence that he sexually violated Ascensio with a high-heeled shoe. Appellant relies on comments made during opening statements to the jury, where the prosecutor referenced that Ascensio's injuries included "a woman's shoe shoved into her genital region." N.T., 1/13/2000, at 440. Appellant further cites the testimony of Detective Michael Scott Hose, who stated that while processing the crime scene he observed Ascensio's body in a staged position, half-dressed, lying on her back with her arms at her sides, with her head resting on a pillow and "a high-heel shoe jammed up into her crotch area." N.T., 1/14/2000, at 756. Notably, Detective Hose gave no opinion as to who placed the shoe in that manner. Finally, Appellant relies on the following statement made during the prosecutor's closing argument, "Then someone, still out of anger, took a shoe and

violated Miriam Ascensio again, and that someone was the Defendant." N.T., 1/19/2000, at 1206.

Viewing these references as though they were substantive evidence demonstrating that he sexually assaulted Ascensio with a shoe, Appellant contends that trial counsel was ineffective for failing to challenge the admission of this purported bad act evidence and for failing to refute such evidence with expert testimony. To demonstrate the arguable merit of his ineffectiveness claim, Appellant relies on the post-conviction testimony of Dr. Charles Wetli, who opined that the photographs of Ascensio's body were inconsistent with sexual assault with a shoe or any type of penetration and depicted, instead, that Ascensio was lying on the shoe, and that the shoe was impressed between her buttocks. N.T., 7/27/2015, at 117. Appellant maintains that Dr. Wetli further opined that the autopsy report supported his conclusion as the report indicated that there were no injuries to Ascensio's anal or vaginal areas. *Id.* He contends that crime scene investigator, Robert Tressel, offered a similar opinion. Cross Brief of Appellee, at 89 (citing N.T., 3/28/2016, at 47).

In light of this testimony, Appellant contends that trial counsel had no reasonable basis for failing to challenge the evidence suggesting that he sexually assaulted Ascensio with a shoe. Finally, Appellant contends that if trial counsel had objected to the challenged evidence or refuted it with expert testimony, there is a reasonable probability that at least one juror would have given more weight to the defense's good character evidence and found that the Commonwealth failed to meet its burden of proving guilt beyond a reasonable doubt.

The Commonwealth's straightforward response is that the trial court never admitted any evidence of Appellant's uncharged sexual assault; thus, trial counsel cannot be deemed ineffective for failing to take steps to exclude or refute the same. It contends

that while the prosecutor stated in closing arguments that Appellant violated Ascensio with a shoe, arguments are not evidence and the prosecutor's reference emanated from Detective Hose's testimony that when he discovered Ascensio's body, there was a high-heeled shoe protruding from her genital region. Thus, the Commonwealth submits, Appellant's ineffectiveness claim lacks arguable merit, and trial counsel had a reasonable basis for not pursuing the issue. Further, according to the Commonwealth, it strains logic to conclude that Appellant was prejudiced or that the jury would have given more weight to the character evidence had trial counsel refuted the evidence of the shoe's placement.

The PCRA court denied Appellant relief, although it did not address specifically whether the court admitted evidence at trial that Appellant sexually assaulted Ascensio with a shoe or whether trial counsel was ineffective for failing to object to or refute the same. Instead, the court viewed Appellant's contention, perhaps too narrowly, as challenging only trial counsel's failure to object to the closing remarks of the prosecutor, holding that trial counsel was not ineffective because the challenged comment could reasonably be inferred from Detective Hose's testimony that he observed the shoe protruding from Ascensio's genital area. *See* PCRA Court Opinion, at 61. [12, 13]

---

[12] To be precise, Appellant's claim on appeal is not that trial counsel was ineffective for failing to object to improper comments by the prosecutor, but that trial counsel was ineffective for failing to object to evidence that he sexually assaulted Ascensio with a shoe. Appellant does not challenge the PCRA court's holding that the prosecutor's closing remarks in this regard were permissible as they could reasonably be inferred from Detective Hose's testimony.

[13] Appellant also contends that the PCRA court erred by deeming this claim waived as previously litigated. Cross Brief for Appellee, at 91-93. We do not interpret the PCRA court's opinion as so holding. While the court deemed waived as previously litigated a claim captioned "Evidence of Uncharged Sexual Assault," the several claims discussed in that portion of the opinion related to trial counsel's ineffectiveness for failing to challenge the admission of evidence of sexual activity between Ascensio and Appellant's brother. *See* PCRA Court Opinion, at 62. The claims deemed previously litigated did not involve an uncharged sexual assault committed upon Ascensio by Appellant with a shoe.

We find no legal error in the trial court's ultimate denial of relief on this claim. As the Commonwealth cogently notes, Appellant identifies no substantive evidence admitted at trial establishing that he violated Ascensio with a shoe. Rather, the prosecutor only suggested the same during closing arguments, based upon Detective Hose's trial testimony regarding the placement of the shoe in Ascensio's genital area. As statements made during counsel's closing arguments do not constitute evidence, there is no factual predicate for Appellant's ineffectiveness claim. *See Commonwealth v. Freeman*, 827 A.2d 385, 413 (Pa. 2003) (holding that "to the extent appellant alleges that the prosecutor's argument served to introduce 'evidence,' he is mistaken;" "[i]t is well settled in the law that attorneys' statements or questions at trial are not evidence") (internal citation omitted). Absent a factual basis, there is no arguable merit to Appellant's claim that trial counsel was ineffective for failing to challenge or refute evidence of an uncharged sexual assault. Accordingly, the derivative claim of appellate counsel ineffectiveness likewise fails for lack of arguable merit.

### (3) Cumulative Error

In his final claim, Appellant submits that he is entitled to relief from his conviction because the cumulative effect of the two trial errors discussed *supra* denied him a fair trial.[14] The Commonwealth views this contention as an undeveloped, "boilerplate" claim that should be dismissed. Consolidated Reply Brief for Appellant and Brief for Cross-Appellee, at 99. In *Commonwealth v. Johnson*, 966 A.2d 523, 532 (Pa. 2009), this Court held that cumulative prejudice from multiple instances of deficient performance may properly be assessed in the aggregate when the individual claims have failed due to lack

---

[14] Appellant raises a similar claim of cumulative error based on errors that occurred in the penalty phase of trial, which allegedly denied him a reliable capital sentencing proceeding. As we are affirming the PCRA court's grant of a new penalty hearing on a single claim, we need not address any penalty phase argument based upon cumulative error.

of prejudice.  As we have not denied Appellant relief on any claims due to lack of prejudice, he is not entitled to relief based upon cumulative error.

## B. Commonwealth's Appeal

### 1. *Violation of Caldwell v. Mississippi*

The Commonwealth first contends that the PCRA court erred by granting Appellant a new penalty hearing based on a violation of *Caldwell v. Mississippi*, *supra*.  To understand the parties' arguments and the PCRA court's holding, we begin with a discussion of that decision.  In *Caldwell*, the defendant was charged with capital murder and was tried pursuant to Mississippi's capital punishment statute.  In defense counsel's closing argument, counsel emphasized that it was the jury's responsibility to choose whether the defendant received life imprisonment or the death sentence.  In response, the prosecutor sought to minimize the importance of the jury's role by stating to the jury that the defense "would have you believe that you're going to kill this man and they know -- they know that your decision is not the final decision . . . . Your job is reviewable." *Id.*, at 325.  The trial court overruled defense counsel's objection to that statement, deeming it "proper that the jury realizes that [its verdict] is reviewable automatically as the death penalty commands." *Id.*  When closing arguments continued, the prosecutor reiterated that the state was not asking the jury to kill the defendant, and that the decision the jury reaches is automatically reviewable by the Supreme Court. *Id.*, at 325-26.  The jury thereafter convicted the defendant and returned a sentence of death.

On appeal to the Mississippi Supreme Court, the defendant contended that the prosecutor's argument rendered the capital sentencing proceeding unfair and violated the Eighth Amendment to the United States Constitution.[15]  The Mississippi Supreme Court

---

[15] The Eighth Amendment provides "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. CONST., amend. VIII.

could not reach consensus on the Eighth Amendment claim and affirmed the death penalty by an equally divided court.

The United States Supreme Court granted *certiorari* to address "whether a capital sentence is valid when the sentencing jury is led to believe that responsibility for determining the appropriateness of a death sentence rests not with the jury but with the appellate court which later reviews the case." *Caldwell*, 472 U.S. at 323. The Court answered this inquiry in the negative, holding that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Id.*, at 328-29.

The Court explained several ways that unreliability and bias could pervade a capital sentencing determination in violation of the Eighth Amendment where the prosecution suggests that the sentencing jury may shift its sense of responsibility to an appellate court. *Id.*, at 330. First, the Court recognized that bias against the defendant could arise because the jury is unaware of the institutional limits placed on an appellate court that render it ill-suited to evaluate the propriety of a death sentence in the first instance. *Id.* These limitations include the inability of an appellate court to examine the intangibles that a jury might consider in its sentencing determination, the inability to examine the individuality of the defendant, and the inability to afford mercy to a defendant. *Id.*, at 330-31. Second, even when a jury may not be convinced that a death sentence is appropriate, if the jury feels less responsibility for the verdict, it may wish to "send a message" of disapproval for the defendant's acts, believing that the appellate court could correct its error on appeal. *Id.*, at 331. Third, the Court found that bias could result from a jury's lessened sense of responsibility where the jury returns a death sentence based on the belief, unrelated to a legitimate sentencing concern, that delegation of sentencing

authority from the jury to the appellate court occurs only where a death sentence is rendered. *Id.* at 332. Finally, the Court explained that a jury may impermissibly minimize the importance of its sentencing role when told by the prosecutor that its decision is automatically reviewable as such argument would be highly attractive to jurors who are placed in an unfamiliar situation and who are called upon to make a life and death decision. *Id.*, at 332-33.

Notably, the Court rejected the State's contention that the prosecutor's improper argument was "corrected" by a subsequent prosecutorial statement, informing the jury that it played an important role in the sentencing process. *Id.*, at 340 n.7. The Court emphasized that the prosecutor did not retract or undermine his earlier suggestion that the appellate court would review the jury's verdict of death to guarantee its correctness. *Id.* The Court held that "the prosecutor's argument sought to give the jury a view of its role in the capital sentencing procedure that was fundamentally incompatible with the Eight Amendment's heightened 'need for reliability in the determination that death is the appropriate punishment in a specific case.'" *Id.*, at 340 (citing *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (plurality opinion)). If left undisturbed, the High Court reasoned, such comments "might so affect the fundamental fairness of the sentencing proceeding as to violate the Eighth Amendment." *Id.*

Based on *Caldwell*, Appellant contended in his PCRA petition that comments made by the prosecutor and the trial court during the penalty phase opening and closing arguments led the sentencing jury to believe that the responsibility for determining the appropriateness of his death sentence rested with the trial court, and not within the exclusive domain of the jury. He asserted that the prosecutor repeatedly informed the jury that its verdict was a mere "recommendation" to the court and the trial court expressly endorsed that view. Appellant submitted that trial counsel was ineffective for failing to

object to these statements, and that appellate counsel was ineffective for failing to challenge trial counsel's performance on appeal.

The record establishes that on six occasions during the opening statements and closing arguments of the penalty phase of trial, the prosecutor referred to the jury's verdict as a "recommendation." *See* N.T., 1/20/2000, at 21 (stating to the jury in penalty phase opening statements that "you are about to consider whether or not to recommend a sentence of death" and "your only response in this matter is to recommend a sentence of death"); *id.*, at 22 (stating that if the jury finds that the aggravating factors outweigh the mitigating circumstances the jury "must return a verdict of death and recommend death for the killing"); N.T., 1/21/2000, at 127 (stating during closing arguments that the jury's duty is "solemn in that you are recommending, if you find that the aggravating circumstances outweigh the mitigating circumstances, the death penalty in this case"); *id.*, at 134 (stating that when the judge asks the jury what the sentence is, the jury should respond, "we recommend that the Defendant be imposed with a sentence of death"); *id.*, (stating that "[t]he law requires a recommendation of death").

Following these references, during defense counsel's closing argument, the following exchange occurred wherein the trial court agreed with the prosecutor's misstatement of the law.

> DEFENSE COUNSEL: But again, that is why I chose you folks because I thought you would all try to be fair. So don't look at him and say I hate that guy, he's got to get the death sentence. That is not what this is all about. And [the prosecutor] certainly gave an impassioned plea. But you don't have to kill anybody. You don't have to kill anybody.
>
> PROSECUTOR: I object to that argument. They are not doing it. They are recommending the sentence.
>
> THE COURT: Objection sustained. That is an improper statement, ladies and gentlemen. I am the sentencing person. Your decision is a recommendation to the court.

N.T., 1/21/2000, at 136.

Later the same day, in direct contravention of the trial court's sentiment above, the court included in its final charge to the jury the following statement, "Remember that your verdict is not merely a recommendation. It actually fixes the punishment of life or death, life imprisonment or death." *Id.,* at 168. The trial court did not acknowledge its inconsistent statement made hours earlier or convey to the jury that the court's prior statement was erroneous.

As noted, the PCRA court granted Appellant a new penalty hearing on his claim that counsel was ineffective for failing to object to the *Caldwell* violation. Based on the record summarized above and the clear pronouncement in *Caldwell*, the PCRA court found merit to the ineffectiveness claim, thereby satisfying the first prong of the ineffectiveness standard. PCRA Court Opinion, at 72. Regarding the reasonable basis prong, the trial court observed that trial counsel candidly recognized at the PCRA evidentiary hearing that he failed to object to the *Caldwell* violation. *See* N.T., 7/27/2015, at 33-34 (trial counsel acknowledging that he technically should have objected when the court indicated that the jury's verdict was a recommendation, but opining that he believed the jurors knew what they were doing because the trial court explained it to them during *voir dire*).

The PCRA court recognized that the trial judge, in the midst of final penalty instructions, stated correctly that the verdict was not a mere recommendation. PCRA Court Opinion, at 72. The court held, however, that the latter jury charge "only served to create confusion in the jurors' minds as to what their role in actual sentencing was." *Id.* The court concluded that prejudice was established as "the pervasive references of the prosecutor to the jury that they [sic] were making a sentencing 'recommendation,' which was actually reinforced at one point by the [c]ourt, and trial counsel's failure to object,

deprived [Appellant] of a fair penalty phase trial." *Id.*, at 73 (citing *Caldwell*, 472 U.S. at 328-29).

The Commonwealth challenges the PCRA court's determination. It contends that regardless of the comments made by the prosecutor and the trial court during the penalty phase closing arguments, the final charge to the jury included at least fifteen references, instructing the jury regarding its "sentence" of either life imprisonment or death. *See, e.g.,* N.T., 1/21/2000, at 163 (stating that the jury must decide "whether to sentence the Defendant to death or life imprisonment); *id.*, (stating that the jury's verdict "must be a sentence of death" if you find at least one aggravating circumstance and no mitigating circumstances); *id.*, at 164 (stating that "[i]f you do not all agree on one or the other of these findings, then the only verdict that you may return is a sentence of life imprisonment"). The Commonwealth concludes that the trial court's repeated use of the term "sentence" in its final jury charge conveyed to the jury that its verdict was final and dispelled any notion that the jury's verdict served only as a recommendation to the court regarding whether Appellant should be sentenced to life imprisonment or death. Moreover, the Commonwealth points out that, consistent with Pa.R.Crim.P. 808, the sentencing verdict slip also directed the jury to indicate "whether the sentencing verdict is death or life imprisonment." Thus, it argues that there is no arguable merit to Appellant's ineffectiveness claim based upon a *Caldwell* violation.

In support of its contention, the Commonwealth relies on this Court's decision in *Commonwealth v. Uderra*, 862 A.2d 74 (Pa. 2004), where we rejected a claim of trial counsel ineffectiveness for failing to lodge a *Caldwell* objection to a statement made by the prosecutor during closing argument in the penalty phase of trial. The challenged prosecutorial statement in *Uderra* provided, "I am not going to ask you . . . to give Jose Uderra the death penalty because you do not by your verdict give Jose Uderra the death

penalty." *Id.*, at 94. The prosecutor further stated, "What I am going to ask you to do is not somehow give him the death penalty . . . but I am going to ask you to recognize that he has earned the death penalty under the statutory system. . . ." *Id.* The Commonwealth contends that while the *Uderra* Court disapproved of the statement in isolation because it violated *Caldwell*, it held that when read in context, the prosecutor was merely advising the jury that if it found one aggravating circumstance and no mitigating circumstance, a verdict of death was required. Thus, the Commonwealth maintains, this Court in *Uderra* rejected the ineffectiveness claim for lack of arguable merit.

The Commonwealth submits that this case is akin to *Uderra* because, "[w]hen viewing the penalty phase record as a whole, it is clear that the jury's role in sentencing was properly described by the [c]ourt." Consolidated Reply Brief for Appellant and Brief for Cross-Appellee, at 64-65 (citing, *inter alia, Commonwealth v. Abu Jamal*, 555 A.2d 846, 856 (Pa. 1989) (addressing a *Caldwell* claim upon review of the sentence hearing record "in its entirety")). Finally, the Commonwealth suggests that the word "recommend" in connection with a jury's verdict in a capital case "can be considered a colloquial use of the term rather than an articulation of a standard," and cites cases where both this Court and the Superior Court have used such term colloquially in the recitation of facts in a capital case. *Id.*, at 65 (citing, *e.g.*, *Commonwealth v. Jacoby*, 170 A.3d 1065, 1075 (Pa. 2017) (stating as a factual matter, "At the conclusion of the penalty phase, the jury recommended a death sentence. On October 9, 2014, the trial court formally sentenced Jacoby to death.")).

Appellant responds that the PCRA court correctly determined that trial counsel was ineffective for failing to object to the improper comments made by the prosecutor and the trial court, which violated his Eight Amendment right to a reliable sentencing proceeding. Categorizing this case as a "textbook example of *Caldwell* error," Appellant contends that

there is clear merit to the ineffectiveness claim as misleading a capital jury about its responsibility in determining the appropriate sentence causes substantial unreliability as well as bias in favor of death sentences. Cross Brief of Appellee, at 14. He emphasizes that each of the six times the prosecutor mischaracterized the jury's sentencing verdict as a mere "recommendation," the prosecutor encouraged the jury to view its verdict as advisory and to believe that the court would ultimately decide Appellant's sentence.

Rather than issue a curative instruction, Appellant asserts, the trial court, like the trial court in *Caldwell*, endorsed the prosecutor's view that the jury's sentencing verdict was a mere recommendation in contravention of Pennsylvania's capital sentencing statute, which vests exclusive sentencing discretion in the jury. Cross Brief of Appellee, at 17 (citing 42 Pa.C.S. § 9711(a)(1) (providing that "the jury shall determine whether the defendant shall be sentenced to death or life imprisonment"); *id.,* § 9711(f)(1) (providing that "the jury shall deliberate and render a sentencing verdict"); and *id.*, § 9711(g) (providing that "[w]henever the jury shall agree upon a sentencing verdict," the trial court shall receive and record the verdict and "thereafter impose on the defendant the sentence fixed by the jury")).

Appellant contends that this Court required a new penalty hearing in *Commonwealth v. Jasper*, 737 A.2d 196 (Pa. 1999), which involved far less egregious circumstances than those presented here. Appellant explains that in *Jasper*, the trial court charged the jury that if it imposed a death sentence, "the case will be reviewed thoroughly" and "the death penalty may be carried out." *Id.*, at 196. Notwithstanding that the trial court advised the jury three times that its verdict was not a mere recommendation, the *Jasper* Court found that, pursuant to *Caldwell*, the improper argument minimized the

jury's sense of responsibility in determining the defendant's sentence in violation of the Eighth Amendment and Article I, Section 13 of the Pennsylvania Constitution.[16]

Appellant submits that our holding in *Jasper* refutes the Commonwealth's contention that the trial court's single, correct reference in its final jury charge cured any errors arising from the repeated misstatements of the law that the prosecutor and the trial court made during closing arguments. Citing both the High Court in *Caldwell* and this Court in *Jasper*, Appellant posits that a strong curative instruction is required, which expressly corrects the prior misstatement and firmly establishes that the jury alone is responsible for the sentence. Cross Brief for Appellee, at 20 (citing *Caldwell*, 472 U.S. at 339; *Jasper*, 737 A.2d at 197-98). Here, Appellant argues, the trial court did not provide such instruction but, rather, simply gave a contradictory statement of the law.

Relating to the reasonable basis prong of the ineffectiveness standard, Appellant discounts trial counsel's assertion that while he technically should have objected to the *Caldwell* violations, he believed the jury knew what it was doing, considering that the court had explained the jury's sentencing role during *voir dire*. Cross Brief of Appellee, at 22, (citing N.T., 7/27/2015, at 33-34). Appellant argues that the record does not support this assertion as the court gave an instruction during individual *voir dire* nearly identical to the misstatement of the law conveyed to the jury during oral arguments.[17] Appellant concludes that trial counsel's hindsight explanations cannot provide a reasonable

---

[16] Article I, Section 13 of the Pennsylvania Constitution provides that "Excessive bail shall not be required, nor excessive fines imposed, nor cruel punishments inflicted." PA. CONST., art. I, 13.

[17] Appellant cites the transcript from the individual *voir dire* of a prospective juror where the trial court states that the court would "be the one to ultimately sentence a person who was convicted of first degree murder and either give him life imprisonment or death . . . you're not actually sentencing a person. I would be the one to sentence him but I would go along with the jury's verdict." N.T., 1/12/2000, at 393.

strategic basis for failing to comply with clear federal and state law precedent, which prohibits the diminishing of the jury's role in sentencing in capital cases.

Finally, Appellant contends that prejudice arising from the failure to object to the *Caldwell* violations is obvious as trial counsel's inaction undermined the confidence in the sentencing verdict. He reiterates the numerous times the prosecutor misstated the law, the trial court's express endorsement of that legally erroneous view, and the nature of the improper remarks, which were not mere generic references to the appellate process but, rather, were unambiguous and clear directives to the jury that it was not the final arbiter of the sentence. Appellant points out that this is not a case where the death penalty was required by statute, *i.e.*, where the jury found only aggravating circumstances and no mitigating circumstances. He emphasizes that the jury found both mitigating and aggravating factors, which it was required to weigh to determine the appropriate sentence. Under these circumstances, Appellant insists that prejudice is established and that this Court should affirm the grant of a new penalty hearing.

Upon review, once again we conclude that the PCRA court's findings of fact are supported by the record and that its legal conclusions are free from error. Addressing the arguable merit prong of the ineffectiveness standard, we keep in mind that prosecutorial statements comprising alleged *Caldwell* violations "must be viewed in light of the circumstances of the particular case to determine if those comments created a risk that the jury's deliberations and death penalty sentence were tainted by impermissible considerations." *Commonwealth v. Smith*, 650 A.2d 863, 869 (Pa. 1994) (citing *Abu-Jamal*, 555 A.2d at 855); *see also Romano v. Oklahoma*, 512 U.S. 1, 9 (1994) (explaining that *Caldwell* prohibits prosecutorial comments that "mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision") (citation omitted).

We agree with Appellant's characterization of this case as demonstrating a "textbook example of *Caldwell* error." As discussed at length *supra*, the prosecutor told the jury six times, without objection or correction, that the jury's sentencing verdict was a mere recommendation, leading the jury to believe that it was not responsible for determining Appellant's final sentence. The last of these misleading comments came during defense counsel's closing argument, where defense counsel was attempting to appeal to the jury's proper sentencing role when the prosecutor interrupted with an objection and a reminder that the jury's "decision is a recommendation to the court." N.T., 1/21/2000, at 136. To compound the impact of these erroneous assertions upon the jury's deliberations, the trial court sustained the prosecutor's objection, and expressly conveyed to the jury, "I am the sentencing person. Your decision is a recommendation to the court." *Id.*

These statements reflect the precise sentiments that the High Court in *Caldwell* condemned as "constitutionally impermissible" because it "rest[s] a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Caldwell*, 472 U.S. at 328-29. The instant case is arguably more egregious than *Caldwell* because the improper comments made herein were more pervasive and did not merely reference the appellate court's role in the sentencing process, but specifically directed the jurors that the trial court, and not the jury, would determine whether Appellant would receive a sentence of life imprisonment or death.

We reject the Commonwealth's contention that the trial court's final jury charge cured any error that arose from the improper comments of the prosecutor and the trial court during the penalty phase closing arguments. While the final charge correctly stated that the jury's "verdict is not merely a recommendation" and that it "actually fixes the

punishment," N.T., 1/21/2000, at 168, the trial court did not acknowledge that it had given an entirely inconsistent directive to the jury only a few hours earlier. Significantly, nothing in the trial court's final charge made clear to the jury that one of the contradictory instructions was erroneous. *See Francis v. Franklin*, 471 U.S. 307, 322 (1985) (holding that "[l]anguage that merely contradicts and does not explain a constitutionally infirm instruction will not suffice to absolve the infirmity"); *Commonwealth v. Cain*, 398 A.2d 1359, 1363 (Pa. 1979) (stating that "[w]here a court gives two instructions, one erroneous and prejudicial and the other correct, reversible error occurs").[18]

In fact, as Appellant cogently notes, this Court in *Jasper* found a *Caldwell* violation where the trial court had given an improper directive to the jury, followed by three correct instructions. In *Jasper*, the trial court instructed the jury, "Somewhere down the line, if you do impose the death penalty, the case will be reviewed thoroughly. And after thorough review, the death penalty may be carried out." *Jasper*, 737 A.2d at 196. Thereafter, the trial court instructed the jury three times that its determination was not a mere recommendation, but that it was actually deciding the sentence. Nevertheless, this Court concluded that the trial court's instruction violated the Eighth Amendment under *Caldwell* because it minimized the jury's sense of responsibility in determining the defendant's sentence. We explained that "by stating that any death sentence would be 'reviewed thoroughly' and 'may be carried out,' the [trial] court unduly and unnecessarily emphasized the role of appellate courts and gave the impression that any mistake which the jury may make in imposing the death penalty would be corrected by appellate review."

---

[18] The High Court in *Caldwell* reached a similar conclusion, finding unpersuasive the State's argument that the prosecutor's improper comments, minimizing the jury's role by emphasizing appellate review, were "corrected" by later prosecutorial comments indicating that the jury played an important role in the sentencing process. *Id.*, at 341 n.7 (stating that "the prosecutor did not retract, or even undermine, his previous insistence that the jury's determination of the appropriateness of death would be reviewed by the appellate court to assure its correctness").

*Id.*, at 197. Notably, this Court rejected the Commonwealth's contention that the trial court's correct instructions cured the improper remarks, holding that "the plain import of the court's remarks is that although the jury may impose the death penalty, it may not be carried out, thus removing from the jury the responsibility for imposing the death penalty." *Id.* We concluded that this minimization of the jury's sense of responsibility for its verdict was a clear violation of the Eighth Amendment to the United States Constitution, as well as a violation of Article I, Section 13 of the Pennsylvania Constitution. *Id.,* at 198. We reach the same conclusion here.[19]

Also unpersuasive is the Commonwealth's contention that this case is akin to *Uderra*, where we ultimately denied relief on a *Caldwell* claim. In *Uderra*, based on *Caldwell's* Eighth Amendment requirement of maintaining the jurors' sense of responsibility for the verdict, this Court disapproved of the prosecutor's admonition to the jurors that "you do not by your verdict give Jose Uderra the death penalty." *Uderra*, 862 A.2d at 94. Nonetheless, when read in context, we concluded that the prosecutor was referencing the statutory requirement for the jury to return a death verdict upon determining that there was at least one aggravating and no mitigating circumstances. *Id.,* at 95. Emphasizing that the trial court reminded the jury of its fundamental responsibility for the verdict both before and after the challenged comments by the prosecutor, this Court in *Uderra* held that "there is no reasonable probability that [the prosecutor's comments] meaningfully diminished the jurors' understanding of their overall role as the sentencer." *Id.* For the reasons set forth above, we cannot conclude that the comments

---

[19] We further disagree with the Commonwealth's suggestion that because the final jury charge employed the term "sentence" at least fifteen times, any notion that the jury's sentencing verdict was a mere recommendation was dispelled. The fatal defect in this argument is that the improper comments by the prosecutor referred repeatedly to the jury's "recommendation" of a "sentence" of death. *See* N.T., 1/20/2000, at 21, 134. Thus, references in the final jury charge to a "sentence of death" did not alter the jury's perception that such sentence was not final, but only a recommendation.

by both the prosecutor and the trial court in the case before us did not meaningfully diminish the jurors' realization that they were the final arbiters of Appellant's sentence of life imprisonment or death. Accordingly, we find merit to the claim of trial counsel ineffectiveness.

Proceeding to the reasonable basis prong of the ineffectiveness standard, we conclude that trial counsel had no strategic reason for failing to object to arguments and court instructions that constituted clear violations of both our federal and state constitutions. As noted by the PCRA court, trial counsel acknowledged at the evidentiary hearing that he should have lodged a *Caldwell* objection, but noted his belief that the jurors "knew what they were doing" because the trial court had explained it to the jury during *voir dire*. N.T., 7/27/2015, at 33-34. We decline to find this proposed strategy reasonable as it is unsupported by the record and is insufficient as a matter of law, considering the pervasive nature of the misstatements of law conveyed to the jury during closing arguments.

We further agree with the PCRA court that Appellant was prejudiced by trial counsel's inaction when the jury was led to believe that its sentencing verdict was not final and that the trial court would determine whether Appellant received a sentence of life imprisonment or death. *See Commonwealth v. Baker*, 511 A.2d 777, 790 (Pa. 1986) (recognizing "the inherent bias and prejudice" to the defendant that resulted from the prosecutor's argument to the jury that the ultimate responsibility for determining the appropriateness of a death sentence rested with the appellate courts, which violated the Eighth Amendment under *Caldwell* and violated Article I, § 13 of the Pennsylvania Constitution). As Appellant observes, this is not a case where the jury found only aggravating circumstances and no mitigating circumstances, which would result in an automatic sentence of death. *See* 42 Pa.C.S. § 9711(c)(1)(iv) (providing that "[t]he verdict

must be a sentence of death if the jury unanimously finds at least one aggravating circumstance specified in subsection (d) and no mitigating circumstance). Rather, the jury had found both mitigating and aggravating circumstances, which it was required to weigh to determine the appropriate sentence. Because the jury was misled regarding its most fundamental role in determining the sentence of life imprisonment or death, we conclude that the prejudice prong of the ineffectiveness test is satisfied.

Finally, as Appellant's claim is a layered claim of ineffectiveness, we must examine whether appellate counsel was ineffective for failing to present on appeal a claim of trial counsel ineffectiveness for failing to object to the *Caldwell* violation. Having concluded that trial counsel was ineffective for failing to lodge a *Caldwell* objection to the erroneous statements of the prosecutor and the trial court, we find arguable merit to the claim of appellate counsel ineffectiveness. *See Commonwealth v. McGill*, 832 A.2d at 1023 (holding that where the petitioner has proven the three prongs of the *Pierce* standard relative to the performance of trial counsel, the arguable merit aspect of the claim of appellate counsel ineffectiveness is *per se* established).

Further, we conclude as a matter of law that appellate counsel lacked a reasonable strategic basis in failing to raise the *Caldwell* claim on appeal. We reiterate that appellate counsel raised thirty-seven issues on direct appeal, twenty of which alleged the ineffectiveness of trial counsel. None of those issues involved a clear constitutional error warranting the grant of appellate relief, as does the *Caldwell* issue. This approach to appellate advocacy does not reflect a reasonable appellate strategy that furthered Appellant's interests. As the Honorable Ruggero J. Aldisert of the United States Court of Appeals for the Third Circuit has stated, "it is rare that a brief successfully demonstrates that the trial court committed more than one or two reversible errors. I have said in open court that when I read an appellant's brief that contains ten or twelve points, a

presumption arises that there is no merit to *any* of them . . . [and] it is [this] presumption . . . that reduces the effectiveness of appellate advocacy." Aldisert, "*The Appellate Bar: Professional Competence and Professional Responsibility–A View From the Jaundiced Eye of the Appellate Judg*e," 11 Cap. U.L. Rev. 445, 458 (1982) (emphasis in original).

Finally, for the reasons already articulated herein, we conclude that Appellant was prejudiced by appellate counsel's failure to raise the *Caldwell* issue on appeal.[20]

### IV. Conclusion

Accordingly, we affirm the order of the PCRA court, which denied Appellant relief on his guilt phase claims, but vacated his death sentence and granted him a new penalty hearing.

Justices Todd, Donohue, Dougherty, Wecht and Mundy join the opinion.

Chief Justice Saylor joins Parts I, II, III(A)(1), III(A)(3), and III(B) of the opinion, except for the analysis of appellate counsel ineffectiveness, and concurs in the result relative to the balance.

---

[20] In view of our conclusion that Appellant's death sentence must be vacated based on the claim that counsel was ineffective for failing to object to the *Caldwell* violation, we need not address the additional issues set forth in the Commonwealth's brief, which challenge the PCRA court's alternative ground for granting a new penalty hearing.