J-S38019-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| SHARIF COPELAND | : | |
| | : | |
| Appellant | : | No. 579 EDA 2022 |

Appeal from the PCRA Order Entered February 25, 2022
In the Court of Common Pleas of Philadelphia County
Criminal Division at CP-51-CR-0002593-2010

BEFORE:  KUNSELMAN, J., MURRAY, J., and SULLIVAN, J.

MEMORANDUM BY MURRAY, J.:                **FILED NOVEMBER 29, 2022**

Sharif Copeland (Appellant) appeals from the order denying his second petition for relief filed pursuant to the Post Conviction Relief Act (PCRA).[1] We affirm.

On October 1, 2009, at about 8:00 p.m., Sean Griffith (Griffith) left the house of his girlfriend, Tiera Hinson (Hinson).  Griffith encountered his cousin, Rashawn Woodson (Woodson).  Griffith, Woodson and Hinson stood at the corner of Norwood Street and McKean Street in Philadelphia.  After talking for a few minutes, Hinson began to walk away.  The trial court described what next transpired as follows:

> At that point, [Appellant] walked up to [] Woodson and "threw his shoulder" into him.  [] Woodson laughed at [Appellant], who then pulled a silver .22 caliber handgun out of his waistband.  []

---

[1] 42 Pa.C.S.A. §§ 9541-9546.

Woodson began to run away, but [Appellant] chased him and shot at him two times. One of the gunshots hit [] Woodson in his back, entering his lung.

[] Woodson collapsed onto the sidewalk in front of 2012 Norwood Street, coughing up blood. [] Griffith called 911 on his cell phone as [Appellant] ran away from the scene. Police arrived and immediately transported [] Woodson to the University of Pennsylvania Hospital, where he was pronounced dead. The bullet had ruptured the blood vessels in his lung, causing him to die from internal bleeding. [Appellant] was arrested the next day.

Trial Court Opinion, 4/9/12, at 2-3 (citations omitted).

During the investigation, Griffith gave Detective James Pitts (Detective Pitts) a statement identifying Appellant as the shooter. N.T., 7/12/11, at 241-67 (Detective Pitts's testimony). At trial, however, Griffith denied witnessing the shooting and could not recall portions of the statement he gave to detectives. *See id.*

Hinson, in a signed statement to Detective Domenic Mangoni (Detective Mangoni), stated that she saw Appellant running from the scene, with one hand down by his side, immediately after she heard gunshots. *Id.* at 215 (Detective Mangoni's testimony). At trial, Hinson denied portions of her statement and testified she did not recall seeing Appellant at the scene of the shooting. *Id.* at 174-78. The Commonwealth presented the prior inconsistent statements of Griffith and Hinson through the testimony of Detectives Pitts and Mangoni. *See id.* at 241-67, 208-19.

The Commonwealth also presented the testimony of Bijah Freeman (Freeman). Freeman testified that she was with Appellant as she walked on

McKean Street toward her boyfriend's home at 2000 Norwood Street. *Id.* at 70, 72. At 22nd and McKean Streets, Freeman continued walking toward Norwood Street; Appellant continued walking on 22nd Street. *Id.* at 72. After knocking on her boyfriend's door, Freeman heard gunshots coming from Norwood Street. *Id.* at 78. Freeman testified she saw Appellant running toward a gold car. *Id.* at 80, 81.

A jury subsequently convicted Appellant of third-degree murder, carrying a firearm without a license and possessing an instrument of crime (PIC).[2] On September 30, 2011, the trial court sentenced Appellant to 20 – 40 years in prison for his conviction of third-degree murder, and concurrent prison terms of 2 - 4 years for his conviction of carrying a firearm without a license, and 1 - 2 years for his conviction of PIC. On direct appeal, this Court affirmed Appellant's judgment of sentence, and the Pennsylvania Supreme Court denied allowance of appeal. *Commonwealth v. Copeland*, 64 A.3d 833 (Pa. Super. 2012) (unpublished memorandum), *appeal denied*, 67 A.3d 793 (Pa. 2013).

Appellant filed his first PCRA petition on December 17, 2013. In an amended petition, Appellant claimed after-discovered evidence based upon Griffith's claim that Detective Pitts had coerced him into implicating Appellant. *Commonwealth v. Copeland*, 63 A.3d 833, 2012 Pa. Super. LEXIS 5124,

_____

[2] *See* 18 Pa.C.S.A. §§ 2502(c), 6106(a)(1), 907(a).

*7 (Pa. Super. 2012) (unpublished memorandum). This Court denied relief

on the basis that Appellant had waived the claim. *Id.* *10. We further opined:

> [E]ven if the jury heard Griffith testify that Detective Pitts threatened to charge him with the murder, the outcome of the trial would not likely be different as Griffith had already testified at Appellant's trial that he was coerced into giving the statement. Therefore, Appellant's after-discovered evidence claim would fail with regard to [] Griffith's affidavit.
>
> With respect to Appellant's argument that trial counsel was ineffective for failing to elicit testimony from [] Griffith that Detective Pitts coerced him into giving his statement implicating Appellant, we likewise find that the claim would fail, as Appellant cannot prove prejudice. … Given that the jury already heard Griffith's testimony that his statement was false because he was coerced by the Detectives, additional testimony that his statement was false because he was coerced by Detective Pitts by threatening to charge him with the murder would not lead to a "reasonable probability that, but for counsel's error, the outcome of the trial would have been different." *See Commonwealth v. Jones*, 210 A.3d [1014,] 1018-19 [(Pa. 2010)]. Accordingly, Appellant cannot show prejudice and his ineffective assistance of counsel claim fails. *Id.*

*Id.* at *11-13 (some citations omitted).

Appellant filed the instant, counseled PCRA petition on February 10,

2021, and a supplemental petition on May 12, 2021. Appellant claimed newly

obtained affidavits from Freeman and Mitchell Spencer (Spencer), alleging

coercion by detectives, entitled him to relief.[3] Following an evidentiary

hearing limited to Freeman's recantation, the PCRA court dismissed

---

[3] Appellant additionally claimed the Commonwealth had violated *Brady v. Maryland*, 373 U.S. 83 (Pa. 1963), when it failed to provide him with Detective Pitts's police misconduct records. Appellant did not raise this issue in his brief.

- 4 -

Appellant's second PCRA petition on February 25, 2022. PCRA Court Order, 2/25/22. Appellant timely appealed. Appellant and the PCRA court have complied with Pa.R.A.P. 1925.

Appellant presents the following issues for our review:

I.      Did the PCRA court err in finding, without benefit of a hearing, that the newly discovered facts provided by [] Spencer in his September 28, 2020 affidavit that Det[ective] [Charles Grebloski (Detective Grebloski)] fabricated his statement lacked merit?

II.     Did the PCRA court err in finding that the newly discovered recantation of [] Freeman lacked merit. Specifically, that 1) the statement taken by homicide detectives of 12[-]year[-]old [] Freeman and her trial testimony at the age of 15 were not fabricated, tainted and/or the result of threats and coercion and 2) her recantation testimony at the evidentiary hearing was incredible?

Appellant's Brief at 3.

Our Supreme Court has explained:

Upon reviewing an order in a PCRA matter, we must determine whether the findings of the PCRA court are supported by the record and whether the court's legal conclusions are free from error. The findings of the PCRA court and the evidence of record are viewed in a light most favorable to the prevailing party. The PCRA court's credibility determinations, when supported by the record, are binding; however, this court applies a *de novo* standard of review to the PCRA court's legal conclusions. We must keep in mind that the petitioner has the burden of persuading this Court that the PCRA court erred and that such error requires relief. Finally, this Court may affirm a valid judgment or order for any reason appearing of record.

*Commonwealth v. Montalvo*, 205 A.3d 274, 286 (Pa. 2019) (citations omitted).

Appellant's second PCRA petition, filed on February 10, 2021, was facially untimely. **See** 42 Pa.C.S.A. § 9545(b)(1) (requiring any PCRA petition to be filed within one year of the petitioner's judgment of sentence). However, the PCRA court determined that Appellant's claims

> qualified for the newly-discovered facts exception to the PCRA time-bar, since they were premised upon new witness statements that were unknown to [Appellant] and could not have been ascertained by the exercise of due diligence.

PCRA Court Opinion, 4/25/22, at 4 n.2; **see also** 42 Pa.C.S.A. § 4525(b)(1)(ii) (newly-discovered facts exception to the PCRA's timeliness requirement). Our review confirms the PCRA court's determination. Accordingly, we will review the substantive issues presented by Appellant.

Appellant first challenges the PCRA court's conclusion that the newly discovered facts provided in Spencer's September 28, 2020, affidavit did not warrant relief. Appellant's Brief at 12. Appellant recognizes Spencer gave a statement to Detective Grebloski the night of the shooting. **Id.** at 13. According to Appellant, Spencer arrived at the shooting scene just as police left "with the victim in the backseat of their vehicle." **Id.** Appellant states:

> There was a large crowd and everyone was saying "they" shot [Woodson]. The detective asked who shot him. Spencer responded that "they" said [Appellant] did. No information was requested by the detective as to who "they" were.

**Id.**

In his September 28, 2020, affidavit, Spencer confirmed he gave Detective Grebloski a statement, "but the statement that was given to the

- 6 -

court is incorrect[,] I did not say what is stated in the statement the courts have on record taken by [Detective Grebloski] on October 1, 2009 the night of the murder." **Id.** at 14 (quoting Spencer Affidavit, 9/28/20, at 1). Appellant quotes the following statement from Spencer's affidavit:

> Det. Charles Grebloski asked me what happened and I told him I wasn't there. Det. Charles Grebloski [asked me] what [is] my relation to [Woodson] and I told him that he ([Wodson]) is my cousin. Det. Charles Grebloski asked me did I know [Appellant] and I told him yeah that he ([Appellant]) is one of my friend[s] from middle school. Det. Charles Grebloski asked me have I ever known [Appellant] to carry a gun and I told him no, never!
>
> Det. Grebloski altered the original statement by putting his own statement together meaning the words in that statement the courts have on record is not my words they are Det. Charles Grebloski from the homicide unit words and back in 2009 I was 17 years old at the time[,] a minor being int[errogated] by this detective without neither my father or mother present during this inte[rrogation]/interview.

**Id.** at 15 (some spelling corrected, emphasis omitted).

Appellant acknowledges that Spencer was not called as a witness at trial. Nevertheless, Appellant asserts Spencer's testimony would have supported his claims that detectives had fabricated the statements of other witnesses. **Id.** at 14-15. Appellant argues:

> The PCRA Court failed [] to take into consideration the fact that Spencer could have testified to the tactics that Det. Grebloski used in order to manufacture evidence that would inculpate the Appellant. Spencer's testimony would have established that detectives had a pattern of misconduct. Importantly, Spencer's testimony would have put the trial recantation evidence from Hinson and Griffith in a completely different light. Spencer's testimony would have made Hinson and Griffith's recantation testimony much more likely and credible.

*Id.* at 15 (footnote omitted). Appellant claims the detective's fabrication of evidence "was a genuine issue of material fact" warranting an evidentiary hearing on this issue. *Id.* at 18.

To be granted a new trial based on after-discovered evidence, an appellant must show that the evidence "(1) could not have been obtained prior to trial by exercising reasonable diligence; (2) is not merely corroborative or cumulative; (3) will not be used solely to impeach a witness's credibility; and (4) would likely result in a different verdict." *Commonwealth v. Castro*, 93 A.3d 818, 821 (Pa. 2014) (quoting *Commonwealth v. Pagan*, 950 A.2d 270, 292 (Pa. 2008)). The test is conjunctive; the defendant must show by a preponderance of the evidence that each of these factors has been met in order for a new trial to be warranted. *Commonwealth v. Padillas*, 997 A.2d 356, 363 (Pa. Super. 2010).

The PCRA court rejected Appellant's claim, stating:

> According to Spencer's statement to the police on the night of the murder, Spencer said that he received a call from his cousin, Demetrius Caldwell, who told Spencer that his other cousin, [Woodson], had been shot. Second Petition Exhibit P1 at p. 1. When Spencer returned home, he saw police taking[Woodson] away and the crowd around the scene told him that [Appellant] had shot [Woodson]. *Id.* at pp. 1-2. Spencer told police that he believed the murder was gang related but that [Woodson] was not involved in a gang. *Id.* at p. 2. Spencer claimed that members of [Appellant's] gang had previously shot at Spencer's house but that [Appellant] was not one of the shooters and Spencer had never seen [Appellant] with a gun. *Id.* at pp. 2-3.
>
> In his September 28, 2020, affidavit, Spencer claims that the only portions of his October 1, 2009, statement that are true are

- 8 -

that [Woodson] and [Appellant] "did not have any beef," that Spencer did not witness the shooting, that he was [Woodson's] cousin, that he knew [Appellant], and that he had never seen [Appellant] with a gun. Second Petition Exhibit P2. Spencer then alleges that Detective Grebloski "altered the original statement by putting his own statement together." *Id.* The rest of Spencer's affidavit consists entirely of allegations of unrelated abuse by Spencer's probation officer at the time. *Id.*

[Appellant] has failed to show how Spencer's affidavit would likely result in a different verdict if a new trial were granted. Spencer did not testify at [Appellant's] trial, nor was his statement to police ever introduced, so this newly alleged fabrication does not affect, at all, the evidence presented at trial that [Appellant] committed the crimes for which he was convicted.

In addition, the affidavit fails to set forth any admissible evidence helpful to [Appellant] were he to receive a new trial. The only information beneficial to the Commonwealth contained in Spencer's original statement was that people in a crowd told Spencer that [Appellant] shot [Woodson]. That portion of the statement, which reported what other people said to Spencer out of court, was inadmissible hearsay and would never have been heard by a jury. Because everything else in the statement was *helpful* to the defense ([Appellant] was not involved in gang violence, [Appellant] had no beef with [Woodson], and Spencer never saw [Appellant] with a gun), Spencer's averment in his affidavit that the police fabricated the statement is completely unhelpful to [Appellant]. The remainder of Spencer's affidavit relating to his probation officer is irrelevant to this case. No relief is due.

PCRA Court Opinion, 4/25/22, at 5-6 (emphasis in original). The record supports the PCRA court's findings, and we agree with its analysis and conclusion. *See id.* Thus, Appellant's first issue does not merit relief.

In his second issue, Appellant argues the newly discovered affidavit of Freeman, a Commonwealth witness, warrants PCRA relief. Appellant's Brief at 18-19. According to Appellant, Freeman testified at trial that she had just left Appellant and was knocking on her boyfriend's door when she heard

gunshots. *Id.* at 19. Appellant acknowledges Freeman's trial testimony that she then saw Appellant running toward a gold car. *Id.* In her December 15, 2020, affidavit, however, Freeman stated she entered the house after hearing the gunshots. *Id.* Further, Freeman claimed that officers arrived at the house immediately thereafter and handcuffed her. *Id.* at 20. According to Appellant, Freeman could not have seen him running to a gold car because she was inside of the house immediately after the shooting. *Id.*

Appellant additionally directs our attention to Freeman's explanation that she was twelve years old at the time of her police interview, officers refused her request to call her mother, and an officer coerced her to lie at trial. *Id.* at 20-22. Appellant claims this new evidence, if presented at trial, would support the fabrication of evidence claims by Hinson, Griffith and Spencer. *Id.* at 22. Appellant also asserts that Freeman's identification testimony was forever tainted by police tactics. *Id.* at 22-23.

In its opinion, the PCRA court detailed Freeman's various versions of events, addressed Appellant's claim, and concluded it did not warrant relief:

> Freeman testified at trial that sometime between 8 p.m. and 10 p.m. on the night of the murder, she was walking to her boyfriend [] Spencer's house from her house. N.T.[,] 7/13/2011[,] at 70-72. On the way, she briefly walked with and spoke to [Appellant], whom she knew from the neighborhood. *Id.* at 72-75. Freeman went straight to [] Spencer's house after parting ways with [Appellant]. *Id.* at 76. When she reached [] Spencer's house and went to knock on the door, she heard a gunshot from a few houses down. *Id.* at 78-79. All of this testimony was consistent with [Freeman's] statement to police. N.T.[,] 12/3/2021[,] at 54-55.

- 10 -

At trial, Freeman went on to say that after she heard the gunshot, she saw [Appellant] running toward a car. N.T.[,] 7/13/2011[,] at 80-81. When questioned as to why this information was not in her statement to police, she testified that the police had never asked. *Id.* at 84-85. She also claimed at trial that the reason she did not tell police about seeing [Appellant] run to a car was that the detectives did not give her a chance to do so. N.T.[,] 7/13/2011[,] at 102-103; N.T.[,] 12/3/2021 at 86-87. Freeman further testified at trial that she went inside [] Spencer's house and stayed there until the police arrived about five minutes after the shooting. N.T.[,] 7/13/2011[,] at 83.

At the December 3, 2021, evidentiary hearing, on cross-examination, Freeman completely changed her account of the timeline on the night of the murder. She claimed that she actually saw [Appellant] earlier in the evening, then went to meet up with her brothers before they all rode their bicycles to their uncle's house, eventually returning to the neighborhood in a cab and going to [] Spencer's house. N.T.[,] 12/3/2021[,] at 24-28. Just minutes later during the hearing, Freeman changed her story again. When confronted with a statement she gave to a defense investigator on December 15, 2020, Freeman testified that she actually did see [Appellant] on the way from her house to [] Spencer's house, not after she had been to her uncle's house. *Id.* at 37-38. She claimed that she and her brothers went to their uncle's house after she was questioned by police. *Id.* at 37-39.

At the hearing, Freeman testified that the police fabricated nearly her entire statement from the night of the murder. N.T.[,] 12/3/2021[,] at 11-12, 22, 50-52, 56. She testified that, after taking her in handcuffs from Spencer's house to the Roundhouse, detectives typed up a statement but did not show it to her or ask her to sign it. *Id.* at 10-12, 16-17. Freeman did eventually admit that the signature on the statement was hers. *Id.* at 57-58.

At the hearing, Freeman also claimed that detectives coerced her testimony. She claimed that the night before she was due to testify in court, when she was 15 years old and a new mother, police again came to [] Spencer's house looking for her. *Id.* at 17. They cuffed her, told her to leave her baby unattended, and brought her to the Roundhouse. *Id.* at 17-18. Police sat her on a bench and told her she would have to wait there until she was due to testify in court the next morning. *Id.* at 19.

Freeman further testified at the hearing that on the morning of her trial testimony, police escorted her to court and brought her to an anteroom where the same detectives to whom she had given her original statement were waiting. *Id.* at 19-20. The detectives threatened her with jail time if she did not testify in accordance with her written statement, which she had never seen before that morning. *Id.* at 20-21. In her 2020 statement to a defense investigator, Freeman said that the detectives had read her statement to her before court, but at the hearing she denied that they had read it to her. *Id.* at 60-61. She further testified that the defense investigator told her to write that the detectives had read her statement to her. *Id.*

During trial, Freeman gave very specific details about how she perceived the shooting and the moments leading up to the shooting. N.T.[,] 7/13/2011[,] at 79, 94, 109-110. When questioned by the Court during the evidentiary hearing, Freeman said detectives fabricated that level of specific detail for her to testify to at trial and that she was able to remember it. N.T.[,] 12/3/2021[,] at 89. Freeman claimed that, although she had never read her police statement, she memorized what to say in the anteroom before taking the stand at [Appellant's] trial. *Id.* at 64-65.

At the hearing, Freeman claimed that detectives told her to say that she had heard [] Griffith say that [Appellant] was the shooter even though she did not know Griffith. *Id.* at 68-69. However, at [Appellant's] trial, Freeman did not give Griffith's name but rather described his physical appearance. N.T.[,] 7/13/2011[,] at 58-59. Freeman also testified at trial that Griffith was not the one who told her about the shooting, that it was "another teenager." *Id.* When questioned at the evidentiary hearing, Freeman could not explain why she would have said that the speaker was another teenager when the police allegedly told her to say it was Griffith. N.T.[,] 12/3/2021[,] at 75.

At the hearing, Freeman testified that, during her trial testimony, she refused to say she witnessed the shooting, despite detectives telling her to do so, because she "wasn't trying to lie" and did what she "felt was best." *Id.* at 79, 83. Immediately thereafter, she said that the real reason she did not testify that she witnessed the shooting was because the prosecutor cut her off. *Id.* at 80-81, 83.

**Based on this record, the Court found Freeman's testimony to be nearly incomprehensible and entirely incredible.** N.T.[,] 2/25/2022[,] at 19. Additionally, "recantation evidence 'is notoriously unreliable, particularly where the witness claims to have committed perjury.'" *Commonwealth v. D'Amato*, 856 A.2d 806, 825 (Pa. 2004) (quoting *Commonwealth v. Dennis*, 715 A.2d 404, 416 (Pa. 1998)); *see* [*Commonwealth v.*] *Small*, 189 A.3d [961,] 977 [(Pa. 2018)] (noting that there is "no less reliable form of proof, especially where it involves an admission of perjury"). It is impossible to discern which version of events, among her statement to police, testimony at trial, statement to the defense investigator, and frequently self-contradicting and inconsistent hearing testimony, Freeman is alleging is the truth. **Unquestionably, her testimony would not result in a different verdict if a new trial were granted. For that reason, her recantation does not entitle [Appellant] to relief.** *See Padillas*, 997 A.2d at 365 (In determining whether after-discovered evidence would result in a different verdict, a court is to "consider the integrity of the alleged after-discovered evidence, the motive of those offering the evidence, and the overall strength of the evidence supporting the conviction.").

As the record fully supports the Court's finding that [Appellant's] proffered after-discovered evidence would not likely result in a different verdict if a new trial were granted, that finding should not be disturbed. *See* (*Commonwealth v.*] *Green*, 14 A.3d [114,] 116 [(Pa. Super. 2011)]; [*Commonwealth v.*] *Mason*, 130 A.3d [601,] 617 [(Pa. 2015)]. No relief is due.

PCRA Court Opinion, 4/25/22, at 4-10 (emphasis added). Upon review, we agree with the PCRA court, and affirm on this basis with regard to Appellant's second issue.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/29/2022