J-S13040-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| v. | : | |
| DAVID CARL IMHOFF | : | |
| Appellant | : | No. 125 WDA 2023 |

Appeal from the PCRA Order Entered December 28, 2022
In the Court of Common Pleas of Washington County Criminal Division at
No(s):  CP-63-CR-0000281-2013,
CP-63-CR-0001497-2013

BEFORE:   KUNSELMAN, J., BECK, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY KUNSELMAN, J.:               **FILED: June 7, 2024**

David Carl Imhoff appeals from the order denying, after a hearing, his petition filed under the Post Conviction Relief Act (PCRA).  42 Pa.C.S.A. §§ 9541–9546.  We affirm.

Imhoff was charged at two dockets with crimes against his ex-wife, Brenda Worstell, committed on December 22, 2012, and April 24, 2013.  He went to trial on June 10, 11, and 12, 2014, represented by court-appointed counsel.  Worstell testified extensively about the history of her relationship with Imhoff, as well as the specific incidents giving rise to the criminal case. Imhoff testified in his own defense, acknowledging that he struck Worstell in the final incident but denying criminal culpability.

---

[*] Former Justice specially assigned to the Superior Court.

This Court previously adopted the following factual summary from the trial court, detailing the testimony from trial. The emphasized portions (*via* trial counsel's failure to object to them) are challenged in this appeal:

> During trial, the jury heard evidence that on December 22, 2012, and April 24, 2013, Brenda Worstell (hereinafter referred to as "Victim") was physically abused and assaulted by her ex-husband David Carl Imhoff [].
>
> Testimony demonstrated that [Imhoff] and the Victim met in August 2008 when they began dating. **Victim testified that [Imhoff] was a heroin dealer** and from their first date onward they abused heroin together. Victim indicated that she and her daughter moved in with [Imhoff] and his grandmother in September of 2008. Thereafter, the Victim and [Imhoff] were married on July 28, 2009.
>
> Victim testified that [Imhoff] became very controlling a few months into their relationship. She testified that [Imhoff] would control their money and would prohibit her from talking to anyone, including her parents. Victim indicated she was not permitted to go to her parents' home to pick up her daughter. [Imhoff] forced Victim's parents to drop off Victim's daughter at the Hickory One Stop where [Imhoff] would accompany Victim to drop off and pick up Victim's daughter. Victim indicated that her drug addiction became very serious and she was using heroin a few times a day, causing her to drop out of school and restricting her ability to work.
>
> Additionally, Victim testified that [Imhoff] verbally abused her. She recollected that the mental abuse escalated to physical abuse in November 2008, when [Imhoff] pushed her down in front of her daughter. Following that incident, Victim testified that [Imhoff] would physically abuse her any time he became angry. Victim indicated that [Imhoff] would punch and hit her in places that were not visible to others, for instance, in the back of the head or in the ribs. Victim also revealed during her testimony that on more than one occasion [Imhoff] tackled her to the ground.
>
> Thereafter, on or about March 1, 2010, Victim recalled that [Imhoff] sent the Victim and a friend of [Imhoff's] to pick up heroin. [Imhoff] became enraged when the Victim was taking too long to return and would not answer her phone. Upon Victim's

arrival home, [Imhoff] began screaming at Victim. Victim testified that at some point she talked back to [Imhoff]. In response, **[Imhoff] got out of the chair and walked over to the couch where she was sitting, and punched Victim in her mouth with a closed fist.** Victim then attempted to leave, but **[Imhoff] tackled her onto the couch and held her down.** Victim testified she kicked [Imhoff] until she was able to free herself.

Victim testified that she ran upstairs to [Imhoff's] grandmother and asked her to call 9-1-1. During that time, Victim recalled her mouth was profusely bleeding. Victim testified that [Imhoff's] grandmother refused to call the police. Victim indicated that she was able to grab the phone from his grandmother and call 9-1-1. Victim testified that as soon as the 9-1-1 operator picked up, **[Imhoff] punched her in the face and grabbed her by the hair and started dragging her back down the steps.** Victim testified that as he was dragging her down the steps, her leg became trapped in the railing. Victim stated that [Imhoff] continued to pull her down the steps, but she was able to wedge herself in the railing. At that point, he pulled her by her hair and hit her head off of the stairwell. Victim stated that the back of her head was split open and required seven staples to repair the injury.

The Cecil Police Department responded to the incident. Victim testified that she barricaded herself in a bedroom upstairs by pushing the dresser in front of the door. [Imhoff] locked himself in the basement. Cecil police broke the basement door down and arrested [Imhoff]. Victim went outside to the ambulance where she received care for her head, facial cuts and jaw. Victim testified that following her care at the hospital, she returned to [Imhoff's home]. Officer Cathleen Campsey of the Cecil Township Police Department testified criminal charges were filed against [Imhoff] that day. However, the charges were later dropped because the Victim did not wish to pursue the charges.

Victim testified that she decided to divorce [Imhoff] in July 2011. However, Victim decided to rekindle her relationship with [Imhoff] in January 2012. Victim testified that she relapsed and became addicted to heroin again. Thereafter, on December 22, 2012, police were called for another incident.

Victim testified that she and [Imhoff] began to argue after he discovered that she was fired from her job at the Hickory One Stop and she would not provide him with her prescribed anxiety

medication, Klonopin. The Victim, who was wearing a hooded sweatshirt at the time, testified she attempted to walk out the door and leave when [Imhoff] grabbed the Victim by the hood of her sweatshirt and yanked her back in the door. Victim stated that [Imhoff] then threw her down on the bed and threatened her. Victim recalled that she walked out of the room and proceeded to get into her car, but as she was backing out of the driveway, Victim noticed [Imhoff waved] for her to come back. Victim indicated she wanted to hear what he had to say, so she returned, but left her doors locked. Victim rolled the window down and [Imhoff] reached in the window, unlocked the door, and got into the car.

Victim's testimony demonstrated that she and [Imhoff] began arguing again and [Imhoff] grabbed the Victim by her throat with his right hand. Victim stated she was able to open the car door and get out. As she fell from the car, [Imhoff's] nails scratched Victim across her throat and over to her right shoulder. Victim proceeded to call 9-1-1. During that time, [Imhoff's] friend pulled into the driveway, and [Imhoff] got into his friend's car and left. Victim followed [Imhoff] and his friend until they pulled into another friend's driveway. At that point, the police arrived.

[Imhoff] elected to take the witness stand, and testified that he and the Victim became involved in a verbal argument and he told her to leave his house. [Imhoff] testified he told the Victim that "maybe you should just go find somebody else", then she replied, "maybe I already have." [Imhoff] testified that he followed Victim out to her car and started asking her what she meant by that comment. [Imhoff] testified that Victim became angry and floored the car in reverse. [Imhoff] stated that the side mirror of the car hit him and threw him into the car next to him. [Imhoff] testified Victim then put the car in drive and floored it toward him, but she did not hit him. [Imhoff] testified he then entered her car and she became irate. [Imhoff] testified he grabbed Victim by her jacket in order to settle her down. However, when she would not calm down, [Imhoff] indicated he got out of the Victim's car and got into his friend's car. [Imhoff] testified that the Victim was blocking them in and she began ramming her car into the friend's car with them inside. [Imhoff] indicated that they were somehow able to get out of the driveway and leave.

Officer Joshua Withers of the Houston Borough Police Department and Officer Donald Cross of the Canonsburg Police

Department responded to the altercation. Officer Withers and Officer Cross testified that they observed red marks and scratches on Victim's neck. Thereafter, based on his observations, Officer Withers filed Simple Assault and Harassment charges against [Imhoff].

Despite this altercation, Victim resumed her relationship with [Imhoff] approximately three days following the incident. Thereafter, Victim testified that [Imhoff] and Victim moved into a trailer together. Victim testified that despite their reconciliation, the physical abuse continued. However, Victim stated she did not call the police on every occasion abuse occurred.

Thereafter, on or about April 23, 2013, the Victim testified that [Imhoff] sent her to sell heroin for him. However, there was a mishap with the sale. An argument subsequently ensued between the couple. Victim left the trailer and went to stay at her parents' home. Victim communicated to [Imhoff] that she was going to attend a methadone clinic, in aspiration of curing her addiction problem. Testimony demonstrated that [Imhoff] asked Victim to come to the trailer to talk before she went to the clinic. Victim returned to the trailer at [Imhoff's] request.

Victim testified that when she entered the trailer [Imhoff] was sitting on the couch with a handgun lying beside him. The couple subsequently began to argue. The argument escalated and [Imhoff] picked up the gun and pointed it at the Victim's chest. Victim testified she knocked articles off of a coffee table she was standing next to and attempted run for the door. However, before Victim could reach the door, [Imhoff] grabbed the Victim and threw her to the ground. Victim testified that [Imhoff] sat on top of her and pinned her arms down with his legs. Victim testified that [Imhoff] began to choke Victim. [Imhoff] started explaining to Victim what he was going to tell the police after he killed her. Victim recalled that [Imhoff] said he was going to tell the police he had to kill her in self-defense. Thereafter, Victim lost consciousness. Victim regained consciousness, but [Imhoff] was still sitting on top of her. Victim indicated that she went in and out of consciousness four times. On the fourth time Victim lost consciousness, Victim testified that she urinated in her pants.

After Victim came back to consciousness, she recalled that [Imhoff] was pointing the gun in her face and shoving the barrel of the gun in her mouth. Victim also recalled that [Imhoff] repeated "I should just blow your brains out right now." Victim

stated that she somehow escaped [Imhoff's] grasp, but [Imhoff] grabbed her and punched her in the face with a closed fist three times. Victim testified that one punch hit her in the left temple and another below her left eye. Victim indicated that her eye instantly swelled up and began to bleed. [Imhoff] pinned Victim down again and continued screaming at her. Victim testified she attempted to yell for "help," but [Imhoff] put his hand over her mouth. At that point, [Imhoff] began to force Victim to put her hand on the gun. [Imhoff] told Victim he wanted her fingerprints on the gun and force her to fire gunshots, so she would have gunshot residue on her hands. [**Victim testified that Imhoff, using a racial slur, said that he was ready to go back to jail and would kill the first dark-skinned person he saw so that he would never get out.**]

Victim further testified that suddenly [Imhoff] began crying and stopped the attack. Victim recalled that [Imhoff] began begging her not to call the police for an hour until he could "eat all these pills and put a bullet in my brain." Victim testified the gun was lying next to [Imhoff]. Victim recalled that she was afraid to leave, so she sat on the floor and talked to [Imhoff] in an effort to calm him down. Victim noted that [Imhoff] just continued to sit on the floor and rock back and forth crying. Victim stated she then went into the kitchen and shot up a dose of heroin.

Victim then determined that [Imhoff] was not paying attention, so she ran for the door and exited. [**Victim said that she was afraid to go to the trailer park office, as Imhoff had previously told Victim that if the lady there would not let them live at the trailer park, he would slit her throat.**] Victim testified she got into her car and drove to the Hickory One Stop. She sat in the parking lot until a patron of the store pulled into a parking space next to her and realized the Victim was injured. Victim stated the woman helped her out of the car and allowed Victim to sit in her truck. At that time, the Victim called 9-1-1. During the phone call, [Imhoff] called the Victim on the other phone-line. [Imhoff] began accusing the Victim of stealing his gun. Victim stated that the police and an ambulance then came to her aid at the Hickory One Store.

Conversely, [Imhoff] testified that he told the Victim he wanted [to] stop using heroin and they should stop together. However, the Victim showed up at the trailer on April 24, 2013, wanting to get high. [Imhoff] indicated to Victim he was not going to abuse heroin anymore. Thereafter, an argument ensued.

[Imhoff] testified that Victim began demanding heroin and became irate. [Imhoff] testified that Victim began punching him. [Imhoff] admitted that he "smacked" Victim in the eye, but "started crying just as soon as I hit her." [Imhoff] stated that Victim then shot up heroin and left the trailer. [Imhoff] indicated the police then arrived at the trailer and arrested him.

Officer Donald Cooper, a police officer with the Chartiers Township Police Department, testified that he and his partner, Sergeant Harton, received a call from 9-1-1 that an altercation had taken place at a trailer home. The call indicated that the female had been assaulted and had fled the scene. The call further indicated that a male, in possible possession of a handgun, assaulted the female and there was a concern about the male committing suicide.

After the information was received, Sergeant Harton and Officer Cooper traveled to the scene. Sergeant Steven Horvath arrived at the scene to meet the officers. Testimony demonstrated that Sergeant Harton was able to make contact with [Imhoff] via phone. [Imhoff] indicated to the officers he was not present at the trailer. However, when the officers approached the trailer, they heard movement inside. Accordingly, the three officers surrounded the trailer and called for [Imhoff] to come out. Thereafter, about five to eight minutes later, [Imhoff] emerged from the trailer and was detained. [Imhoff] repetitively stated to the officers, "I'll just go back to jail." Thereafter, the officers did a quick sweep of the trailer to look for the weapon; however, they could not locate the gun. [Imhoff] was taken into custody.

The Victim was taken to Canonsburg Hospital. During her stay at the hospital, Sergeant Horvath took information from the Victim of the incident. The Victim later left Canonsburg Hospital and went to Weirton Hospital.

Victim testified that she sustained several injuries including a swollen and black and blue left eye; cut above her left eye; cuts and marks on her cheek, nose and right arm; bloody nose; torn ligaments and tendons from her shoulder to her elbow and her throat was bruised and sore. The Victim was treated for her injuries at Weirton Hospital and was released the same day. The following day, Victim provided a written statement to the police.

A few days after Victim left the hospital, she returned to the trailer where the incident took place in order to retrieve personal belongings. Victim testified that she had an idea where [Imhoff]

hid his gun, which was used during the assault. Victim searched a heating duct for the gun. Victim discovered the gun was located at the bottom of the duct. Accordingly, she called Sergeant Horvath and Officer Cooper who were able to crawl underneath the trailer and retrieve the loaded .22 caliber Beretta handgun 21A 22LR.

*Commonwealth v. Imhoff* (*Imhoff I*), 153 A.3d 1123 (Table), 2016 WL 4696193, at *9–13 (Pa. Super. June 30, 2016) (non-precedential decision) (emphasis added, citations omitted).

A jury found Imhoff guilty of two counts of simple assault, and one count each of aggravated assault, recklessly endangering another person, unlawful restraint—serious bodily injury, terroristic threats, and persons not to possess firearms. On September 15, 2014, Imhoff appeared for sentencing. Imhoff spoke to the trial court about post-trial motions he had filed *pro se*, but he did not exercise his right to allocution. The court noted, without objection by trial counsel, that Imhoff failed to take responsibility for his crimes:

> I agree with the Commonwealth. [Imhoff] has never taken responsibility. He's never come forward and said, "I want to change my life and I'm ready to go to treatment." You sat and told the jury that you wished that you had had treatment and you shed tears as you said maybe if you had treatment something would be different.
>
> But I read your Pre-Sentence Investigation, and I don't see any change. You're still blaming everyone but yourself. Treatment won't help if you're not going to take responsibility.
>
> *     *     *
>
> The Court does find several aggravating circumstances, that being the fact that [Imhoff] does have a prior record that actually exceeds his prior record score. Secondly, that he does have a history of domestic violence. You do have a history of not being compliant with parole and probation, and you do show no remorse

- 8 -

and seem to take no responsibility for this, other than blaming the victim, even for your own drug use. Further, I find it aggravating taking into account the nature of the victim's injuries.

N.T., 9/15/14, at 27–28, 30. The trial court sentenced Imhoff at both dockets to an aggregate term of 15 to 30 years of imprisonment

Imhoff appealed, and this Court affirmed Imhoff's judgment of sentence. **Imhoff I**, **supra**. The Supreme Court of Pennsylvania denied discretionary review on January 4, 2017. **Commonwealth v. Imhoff**, 640 Pa. 598, 164 A.3d 491 (Table) (Pa. 2017).

On April 5, 2017, Imhoff filed a *pro se* PCRA petition, his first. The PCRA court appointed counsel, who filed an amended petition on October 25, 2017. On January 14, 2019, the PCRA court issued a notice of its intent to dismiss Imhoff's PCRA petition without further proceedings "in twenty (20) days from the date of this notice." Notice Pursuant to Pa.R.Crim.P. 907, 1/14/19, at 1.

The PCRA court did not enter a separate order dismissing Imhoff's PCRA petition. On February 4, 2019, Imhoff filed a single notice of appeal from the Rule 907 notice, listing both docket numbers. This Court quashed the appeal based on a violation of **Commonwealth v. Walker**, 185 A.3d 969, 971 (Pa. 2018). **Commonwealth v. Imhoff** (**Imhoff II**) 227 A.3d 381 (Table), 2020 WL 527990 (Pa. Super. Feb. 3, 2020) (non-precedential decision).

On September 14, 2020, Imhoff filed another *pro se* PCRA petition, and the PCRA court again appointed counsel. PCRA counsel, observing that the record did not contain an order dismissing Imhoff's first PCRA petition, moved for the PCRA court to enter a final order. The PCRA court directed counsel to

file an amended petition or no-merit letter, specifying that any amended PCRA petition would "be considered an amendment to the original petitions filed by [Imhoff] on April 5, 2017 and September 14, 2020." Order, 1/27/21.

PCRA counsel filed an amended petition on June 25, 2021. The PCRA court held a hearing on December 16, 2021. Imhoff presented the testimony of his trial counsel and testified on his own behalf. With respect to the trial evidence now at issue, Imhoff's trial counsel testified about relevance but admitted that she did not consider objecting based on the inflammatory nature or risk of prejudice. N.T., 12/16/21, at 13–14 (Imhoff being a heroin dealer); *id.* at 15 (Imhoff attacking Worstell in 2010); *id.* at 17 (Imhoff's statement while attacking Worstell in 2013); *id.* at 18–19 (Imhoff's statement about the trailer park employee). Trial counsel also testified that she did not object to the sentencing court's consideration of Imhoff's failure to take responsibility because she believed it to be a permissible factor in sentencing. *Id.* at 23.

On December 28, 2022, the PCRA court entered an opinion and order dismissing Imhoff's petition, finding Imhoff did not establish that trial counsel was ineffective. Opinion and Order, 12/28/22, at 7. The court ruled that each of Imhoff's failure-to-object claims lacked arguable merit. *Id.* at 8–10 (trial); *id.* at 13–14 (sentencing). The PCRA court also concluded that Imhoff had not shown that any of trial counsel's failures prejudiced him. *Id.* at 14.

Imhoff timely appealed. Imhoff and the PCRA court complied with Pennsylvania Rule of Appellate Procedure 1925. After the PCRA court filed its initial opinion on May 5, 2023, the PCRA court granted Imhoff leave to file an

amended statement of errors. Imhoff did so on June 2, 2023. The PCRA court issued a supplemental opinion on July 14, 2023.

Imhoff now presents the following issues for this Court's review:

1. Did the PCRA court err in denying relief on the ground that Imhoff's amended petition was time-barred where it had previously entered an order granting him leave to file an amended petition relating back to an earlier, timely-filed petition?

2. Is a remand required because the PCRA court rejected several of Imhoff's claims on the ground that the underlying claims lacked arguable merit without considering the underlying claims' merit? Specifically:

   a. it rejected his claim that trial counsel was ineffective in failing to object to testimony that he was a heroin dealer and had previously attacked the victim without considering its risk of unfair prejudice;

   b. it rejected his claim that trial counsel was ineffective in failing to object to testimony that he had threatened another woman in an unrelated incident without considering its risk of unfair prejudice; and

   c. it rejected his claim that trial counsel was ineffective in failing to object to testimony that, during the alleged attack, he indicated that when he was imprisoned for it he would "kill the first [n-word]" he saw, failing to consider its risk of unfair prejudice.

3. Did the [PCRA] court err and/or abuse its discretion in denying Imhoff a new sentencing hearing on the ground that counsel was ineffective in failing to challenge its use of Imhoff's failure to "take responsibility" as an aggravating sentencing factor?

Imhoff's Brief at 4–5 (second alteration added).

Appellate review of a PCRA appeal "is limited to determining whether the findings of the PCRA court are supported by the record and free from legal error." **Commonwealth v. Johnson**, 966 A.2d 523, 532 (Pa. 2009). We are

bound by the PCRA court's factual findings if the record supports them. *Id.* However, the PCRA court's "legal determinations are subject to our plenary review." *Id.* The appellant bears the burden to demonstrate that the PCRA court erred and that relief is due. *Commonwealth v. Feliciano*, 69 A.3d 1270, 1275 (Pa. Super. 2013).

Imhoff first disputes the PCRA court's analysis that his current PCRA litigation is time-barred. *See* 42 Pa.C.S.A. § 9545(b)(1). Imhoff argues that his most recent amended petition relates back to his first, timely *pro se* PCRA petition. Under the circumstances of this case, we agree.

On January 14, 2019, the PCRA court entered a notice of its intent to dismiss Imhoff's first PCRA petition without a hearing. *See* Pa.R.Crim.P. 907(1). The notice advised Imhoff that his petition would be dismissed in twenty days.[1] However, on February 4, 2019, Imhoff filed a notice of appeal from the Rule 907 notice. The PCRA court did not enter any other order prior to Imhoff's notice of appeal. This Court, without addressing the merits, quashed Imhoff's appeal based on a violation of *Walker*, *supra*.

Admittedly, this Court's ruling on Imhoff's 2019 appeal inaccurately described the procedural history. We stated, "Imhoff appeals from the order . . . dismissing his petition filed pursuant to the [PCRA]." *Imhoff II*, 2020 WL 527990, at *1. "The PCRA court dismissed the petition after issuing

---

[1] Twenty days after January 14, 2019, was Sunday, February 3, 2019. As a practical matter, the twenty-day period in the Rule 907 notice would last until on Monday, February 4, 2019.

- 12 -

a notice of its intent to dismiss the petition without a hearing pursuant to Pa.R.[Crim.]P. 907." *Id.* This was wrong.[2] The PCRA court did not dismiss Imhoff's first petition before Imhoff appealed. Even if Imhoff had not violated *Walker*, this Court would have been required to quash Imhoff's 2019 appeal because the Rule 907 notice Imhoff appealed from was not a final order. *See Commonwealth v. Amenuvor*, 2019 WL 4014221 (Pa. Super. 2019) (non-precedential decision); Pa.R.A.P. 341(f).

Imhoff sought to resolve this apparent discrepancy after filing a *pro se* PCRA petition on September 14, 2020, and being appointed PCRA counsel. On January 11, 2021, Imhoff moved for the PCRA court to enter a final order, correctly noting that the PCRA court had not entered an order disposing of Imhoff's petition. The PCRA court then ordered counsel to "file an amended PCRA petition, or a 'no-merit' letter . . . within sixty (60) days of this order. **Should an amended PCRA petition be filed, it shall be considered an amendment to the original petitions filed by [Imhoff] on April 5, 2017 and September 14, 2020.**" Order, 1/27/21 (emphasis added).

Therefore, Imhoff's amended petition, filed June 25, 2021, related back to his first, timely petition, which remained pending before the PCRA court.

_____

[2] The "law of the case" doctrine prohibits us from changing the "resolution of a legal question actually decided by a prior panel of this Court." *In re Estate of Elkins*, 32 A.3d 768, 769 (Pa. Super. 2011) (*en banc*). Here, the quoted statements from the prior panel did not resolve a legal question but rather summarized the procedural history of a matter not necessary to resolve the appeal. *Cf. Commonwealth v. Wallace*, 870 A.2d 838, 842 n.4 (2005) (noting that *dicta* cannot establish the law of the case).

- 13 -

42 Pa.C.S.A. § 9545(b)(1). The PCRA court thus had jurisdiction to consider the amended petition, and this Court has jurisdiction to review it.

We turn to Imhoff's remaining issues. Imhoff's second issue concerns the PCRA court's treatment of three claims that trial counsel was ineffective. Imhoff had challenged trial counsel's failure to object to certain evidence "either because it was irrelevant or <u>because its marginal relevance was outweighed by its risk of unfair prejudice</u>, or as improper act-propensity evidence or prior-bad-acts evidence." Amended Petition, 6/25/21, at 4 (underline added); *see* Pa.R.E. 402, 403, 404. After the PCRA court dismissed his amended petition, Imhoff complained that the PCRA court had failed to consider whether the challenged evidence "was less probative than unfairly prejudicial." Amended Concise Statement, 6/2/23, at 1–2 (¶¶ 2, 5, 6). Because the PCRA court's initial and supplemental Rule 1925(a) opinions did not address the merits of the underlying evidentiary issues, Imhoff requests a remand for the PCRA court to address these claims in the first instance.

To prevail on a claim that counsel was ineffective, a PCRA petitioner must prove by a preponderance of the evidence that counsel's ineffectiveness so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place. *Johnson*, 966 A.2d at 532; 42 Pa.C.S.A. § 9543(a)(2)(ii). "Generally, counsel's performance is presumed to be constitutionally adequate, and counsel will only be deemed ineffective upon a sufficient showing by the petitioner." *Id.* This requires the petitioner to demonstrate three elements: (1) the underlying claim is of arguable merit;

(2) counsel had no reasonable strategic basis for his or her action or inaction; and (3) the petitioner was prejudiced by counsel's act or omission. *Id.* at 533. A finding of "prejudice" requires the petitioner to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* If a petitioner does not prove any of the three elements, then the claim of ineffectiveness fails. *Commonwealth v. Martin*, 5 A.3d 177, 183 (Pa. 2010). A court may analyze the elements of a claim of ineffectiveness in any order, beginning with (and proceeding no further than) an element that the petitioner has failed to prove. *Commonwealth v. Montalvo*, 205 A.3d 274, 286 (Pa. 2019).

Here, Imhoff pled that trial counsel was ineffective during trial for failing to object to portions of Worstell's testimony for different reasons. Amended Petition, 6/25/21, at 4; *see* Pa.R.E. 402, 403, 404. Importantly, an objection sustained on any basis would have produced the same result, *i.e.*, the objectionable testimony would have been excluded. Therefore, although the PCRA court confined its analysis of the merits to relevance under Rule 402, the PCRA court's analysis of prejudice applies with equal force to Imhoff's claims that trial counsel was ineffective for not objecting based on Rule 403. We agree with the PCRA court that Imhoff did not prove that he was prejudiced by trial counsel's failure to object to the challenged evidence for any reason.

> [Even if Imhoff had met the first two elements of his ineffectiveness claims, the PCRA] court does not find that [Imhoff] has been prejudiced by any of the alleged acts or omissions by trial counsel. . . . [At trial], the Commonwealth presented photographic evidence of the [victim's] injuries, testimonial

- 15 -

evidence from police officers of the victim's terrified demeanor after the events occurred, and evidence of the substantial risk presented by the injuries the victim suffered. Furthermore, [Imhoff] acknowledged the assault, admitting that he at least "smacked" the victim. [N.T., 6/10/14–6/12/14, at 211 ("I grabbed her arm and smacked her. . . . I smacked her in the eye.")] None of the alleged actions or omissions by [trial counsel], either individually or cumulatively, caused prejudice to [Imhoff] such that the truth-determining process was undermined. Therefore, [Imhoff's] claims fail under the third prong as [Imhoff] has failed to demonstrate prejudice.

Opinion and Order, 12/28/22, at 14. Imhoff did not show "a reasonable probability" of a different trial outcome given the weight of the remaining evidence against him. *Johnson*, 966 A.2d at 533. Therefore, the PCRA court properly denied Imhoff's trial claims, and we need not remand for the PCRA court to address whether Imhoff demonstrated that those claims have arguable merit. Imhoff's second issue fails.

Imhoff's third issue challenges the PCRA court's rejection of his claim that trial counsel was ineffective for failing to object to the sentencing court's consideration of his failure to take responsibility. The PCRA court ruled that this claim lacked arguable merit, crediting trial counsel's belief that failure to take responsibility was an appropriate sentencing factor and noting the other aggravating factors from sentencing.

This Court, applying the constitutional right against self-incrimination, has held that "silence at sentencing may not form the basis of finding that a defendant failed to take responsibility for his crimes." *Commonwealth v. Bowen*, 975 A.2d 1120, 1127 (Pa. Super. 2009). Likewise, silence may not provide the sole basis for a sentencing court to find that a defendant lacked

remorse. *Id.* Additionally, this Court will not vacate a sentence for improper consideration of failure to take responsibility where the sentencing court also considered permissible factors that do not involve the defendant's silence. *Id.* at 1128. However, when a defendant speaks in court, the sentencing court is permitted to make findings based on the defendant's statements. *Commonwealth v. McLendon*, 293 A.3d 658, 671 (Pa. Super. 2023).

Here, Imhoff testified at trial, admitting to striking Worstell but denying responsibility for the events that left her badly injured. The sentencing court expressed its view regarding Imhoff's potential for rehabilitation based on his lack of accountability for his actions. N.T., 9/15/14, at 28 ("Treatment won't help if you're not going to take responsibility."). After Imhoff indicated he had nothing else to say at sentencing, the court listed multiple factors in imposing its sentence, including Imhoff's history of noncompliance, the extent of Worstell's injuries, and Imhoff blaming Worstell. Based on Imhoff's statements and the other factors considered, Imhoff has not proven arguable merit to his claim that trial counsel was ineffective for failing to object when the sentencing court considered his lack of remorse. Imhoff's third issue fails.

Affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 06/07/2024